# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

CITAK & CITAK, DONALD CITAK and
BURTON CITAK,

                         Plaintiffs,

      - against -

THE ST. PAUL TRAVELERS COMPANIES, INC.
a/k/a ST. PAUL FIRE AND MARINE
INSURANCE COMPANY,

                         Defendant.

-----------------------------------------------------------X

**AMENDED COMPLAINT**

Civil Action No.
07 CIV 5459 (WHP)
__HON. WILLIAM H. PAULEY III__

Plaintiffs CITAK & CITAK, DONALD L. CITAK, and BURTON CITAK, by their attorney, LAW OFFICE OF PETER WESSEL, PLLC, complaining of Defendant THE ST. PAUL TRAVELERS COMPANIES, INC., a/k/a ST. PAUL FIRE AND MARINE INSURANCE COMPANY (hereinafter "ST. PAUL"), respectfully allege as follows, upon information and belief:

### IDENTIFICATION OF PARTIES

1. Defendant ST. PAUL is an insurance company licensed to do business in the State of New York, which transacts business in the County, City, and the State of New York and offers professional liability insurance for lawyers.

2. Plaintiff CITAK & CITAK, ESQS., is a partnership in which DONALD L. CITAK, ESQ., and BURTON CITAK, ESQ., are individual partners.

3. At all times relevant herein, Plaintiff CITAK & CITAK, ESQS., has maintained an office for the practice of law in the County, City, and State of New York.

4. At all times relevant herein, Plaintiffs DONALD L. CITAK, ESQ. and BURTON CITAK, ESQ. were and still are attorneys, duly licensed to practice law in the State of New York and who have maintained their offices for the practice of law in the County, City, and State of New York.

## JURISDICTION

5. This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 on the grounds that i) Plaintiffs are citizens of New York and Defendant is a Minnesota corporation with its principal place of business in St. Paul, Minnesota and ii) based upon the decision of Hon. William H. Pauley III, dated December 26, 2007, the amount in controversy herein has been deemed to exceed Seventy Five Thousand Dollars ($75,000.00).

## FIRST CAUSE OF ACTION

6. Defendant ST. PAUL issued an insurance policy, policy number 507JB0670, which policy provided coverage to Plaintiffs for acts of legal malpractice (hereinafter referred to as "the subject insurance policy"). A copy of the policy is annexed as Exhibit "1" and is incorporated by reference herein.

7. The premium charged by Defendant ST. PAUL for issuing the subject insurance policy to Plaintiffs in the sum of Seven Thousand Thirty-Eight Dollars ($7,038.00) has been fully paid, pursuant to the terms therein. Under the terms of the subject insurance policy, the "policy period" ran from April 28, 2006 through April 28, 2007.

8. Under the terms of the subject insurance policy, Defendant ST. PAUL was to provide a) legal counsel to defend Plaintiffs against claims thereunder on a "claims made" basis during the policy period and b) coverage for any damages thereafter imposed upon Plaintiffs as a result of those claims, all subject to a deductible in the amount of Five Thousand Dollars ($5,000.00).

9. Under the terms of the subject insurance policy, Defendant ST. PAUL is obligated to provide a legal defense and coverage for any damages thereafter imposed upon Plaintiffs for "claims" made

against Plaintiffs and reported to Defendant ST. PAUL within the "policy period."

10.  On or about December 2005, Plaintiffs received a letter from the Departmental Disciplinary Committee of the First Judicial Department of the Supreme Court of the State of New York (hereinafter referred to as the "DDC") enclosing a document that the DDC had received from STUART and CARINA MARTON (hereinafter referred to as the "MARTONS"), who were former clients of Plaintiffs, and requested a response from Plaintiffs. A copy of the MARTONS' document is annexed hereto and incorporated herein as Exhibit "2" (hereinafter referred to as the "MARTONS' DDC Statement").

11.  A)   The MARTONS' DDC Statement does not allege conduct that constitutes legal malpractice;

B)   The MARTONS' DDC Statement ends with the MARTONS' query: "I appreciate your efforts to understand why Mr. Citak ignores me and has not returned to court to represent me";

C)   The Statute of Limitations had not passed in connection with the MARTONS' action against Hogan Contracting, Inc. (hereinafter referred to as "HOGAN"); and

d) The MARTONS were fully capable, intellectually and financially, of retaining other counsel or proceeding *pro se* to prosecute their claim (as they subsequently elected to do).

12.   A)  The MARTONS' DDC Statement does not hint at the possibility of a malpractice action in that it does not:

i)      allege any damages claimed to have been sustained by the MARTONS as a result of any actions or inactions of Plaintiffs; and

ii)     allege any actions or inactions, taken or failed to have been taken, by Plaintiffs, which would constitute legal malpractice or the basis of a malpractice lawsuit.

B) The MARTONS' DDC Statement did not sound in actionable professional malpractice since the relief sought by the MARTONS was to learn why Plaintiffs had allegedly ignored the MARTONS and not returned to court to represent them.

13.   Commencing in November/December 2003 and continuing thereafter, Plaintiffs believed that the MARTONS had elected to abandon their claim, in that the MARTONS canceled an appointment with Plaintiffs, failed to call to re-schedule that appointment, failed to otherwise contact or communicate with Plaintiffs, and failed to remit to Plaintiffs the fees that the American Arbitration Association had

requested in order to proceed with a contemplated arbitration before that entity.

14. The MARTONS failed to advance filing fees for arbitration despite requests by Plaintiffs for such funds which the MARTONS were obligated to pay under the terms of the Retainer Agreement that the MARTONS had previously signed with Plaintiffs.

15. In November/December 2003, the MARTONS were not barred by the statute of limitations in prosecuting their claim against HOGAN. Upon information and belief, the MARTONS were cognizant of this fact and of their ability to retain counsel to further prosecute their action against HOGAN, should they elect to do so.

16. Plaintiffs had a long-standing personal and professional relationship with STUART E. MARTON, who had maintained a separate office on the 20th floor in the same building as did the Plaintiffs, 18 East 48th Street, NY, NY 10017. Plaintiffs had performed legal work for various relatives of the MARTONS (cousins), on both personal matters (involving matrimonial and estate matters), as well as on litigation matters on behalf of corporate entities in which it is believed STUART E. MARTON may have had some ownership or beneficial interest.

17.   Following receipt of the MARTONS' DDC Statement, Plaintiffs adhered to the DDC request and submitted a response thereto to DDC in February 2006.

18.   A)   Upon information and belief, the MARTONS submitted a Reply to Plaintiffs' response in March 2006;

B)   In accordance with DDC practices, the MARTONS were not obligated to and did <u>not</u> provide a copy of their Reply to Plaintiffs; and

C)   Plaintiffs were not provided with a copy of the MARTONS' Reply either by the MARTONS or the DDC.

19.   In accordance with DDC practices, the MARTONS and Plaintiffs agreed to meet with a mediator to discuss the DDC matter.

20.   On June 8, 2006, a mediation was held under the DDC's auspices at the offices of LABATON SUCHAROW & RUDOFF LLP, during which the DDC Mediator, in sum and substance, advised the parties:

A) that it did not appear to him that there had been any violation of any Disciplinary Rules arising from the MARTONS' DDC Statement;

B) that he could not and would not render any opinion as to whether the MARTONS might be able to seek a remedy against Plaintiffs in an action for legal malpractice; and

C) that he would provide a copy of the MARTONS' Reply to Plaintiffs.

21.   At no time prior to the DDC mediation session on June 8, 2006, had there been any mention or discussion of any allegation of legal malpractice raised against Plaintiffs by the MARTONS nor had there been any reference or discussion of any allegation of legal malpractice by the DDC mediator.

22.   A)   As a result of the conversations and/or discussions at the June 8, 2006 DDC Mediation session, Plaintiffs first became aware that a potential claim existed, which would be covered under the terms of the subject insurance policy; and

B)   Prior to June 8, 2006, no complaint, formal law suit or formal proceeding of any kind had been commenced against Plaintiffs, nor had Plaintiffs received any other communication, oral or written, concerning any potential claim that the MARTONS might assert against Plaintiffs for legal malpractice.

23.   On June 15, 2006, Plaintiffs notified JLT Services Corp., the named "Producer" of the subject insurance policy, in writing of a potential claim against them under the terms of the subject insurance policy and requested that JLT Services Corp. take "whatever steps necessary" to notify Defendant ST. PAUL of that potential claim

thereunder. See Letter annexed as Exhibit "3".

24.  Defendant ST. PAUL acknowledged receipt of the claim on June 15, 2006. See Letter annexed as Exhibit "4".

25.  A)  On or about September 18, 2006, the MARTONS served a Demand for Arbitration and a statement of their claim on HOGAN, which ultimately resulted in an award by an AAA arbitrator in favor of MARTON. See Demand annexed as Exhibit "5";

B)  The MARTONS did not notify Plaintiffs that they had filed this arbitration proceeding against HOGAN; and

C)  Upon information and belief, the MARTONS did not notify the DDC that they had commenced an arbitration proceeding that was pending against HOGAN (even though no DDC decision had been rendered as of that date).

26.  A)  On November 3, 2006, a Summons and Complaint was filed in Supreme Court, New York County, under Index No. 116472-06, by the MARTONS, which named the Plaintiffs herein (specifically CITAK & CITAK, ESQS., DONALD L. CITAK, ESQ., and BURTON CITAK, ESQ., as Defendants) and which alleged legal malpractice and sought damages in the specific stated sum of Sixty Thousand Dollars ($60,000.00) (hereinafter referred to as "the MARTONS' Legal

Malpractice Action"); and

B)   Upon information and belief, the MARTONS did not notify the DDC that they had commenced an action in the Supreme Court seeking damages against Plaintiffs for legal malpractice (even though no DDC decision had been rendered as of that date).

27.   On February 13, 2007, Plaintiffs were informed by THOMAS J. CAHILL, ESQ., DDC's Chief Counsel, that no further action would be taken by the DDC regarding the MARTONS' DDC Statement and that the DDC matter would be closed.  See Letter annexed as Exhibit "6".

28.   The MARTONS' Legal Malpractice Action was first served upon Plaintiffs in February 2007, only after the DDC had closed its file regarding the MARTONS' DDC Statement.

29.   Plaintiffs immediately forwarded the MARTONS' Legal Malpractice Action to Defendant ST. PAUL.  See Letter annexed as Exhibit "7".

30.   By letter dated March 5, 2007, Defendant ST. PAUL refused to defend and indemnify Plaintiffs regarding the MARTONS' Legal Malpractice Action, claiming late and improper notice.  See Letter annexed as Exhibit "8".

31.  Defendant ST. PAUL breached its contract with Plaintiffs in refusing to defend Plaintiffs in the MARTONS' Legal Malpractice Action and to provide insurance coverage for any damages that might be imposed upon Plaintiffs as a result thereof.

32.  Plaintiffs have retained separate and independent counsel to commence this action for a declaratory judgment against Defendant ST. PAUL and have incurred, and will incur, fees in connection therewith.

33.  The sums for legal fees being now expended by Plaintiffs as stated above, and the monies that will in the future become necessary to expend for legal fees and other expenses in the prosecution of this action and in the defense of the MARTONS' Legal Malpractice Action, would have been superfluous and unnecessary, if Defendant ST. PAUL honored its obligations and commitments to Plaintiffs under the subject insurance policy and had not breached same.

34.  On or about May 7, 2007, an arbitration award was issued in favor of the MARTONS against HOGAN in the sum of $62,367.32. A copy of the arbitration award is annexed as Exhibit "9".

35. On or about August 8, 2007, the MARTONS converted their arbitration award into a judgment of the Supreme Court of the State of New York, which together with interest, costs and disbursements in the sum of $1,790.76, resulted in a judgment in the amount of $64,158.08 in favor of the MARTONS against HOGAN. See Exhibit "10".

36. Upon information and belief, at no time relevant hereto, did HOGAN have sufficient unencumbered assets from which the judgment ultimately obtained by the MARTONS could have been satisfied.

37. Upon information and belief, the MARTONS have not exhausted efforts to collect upon and/or enforce their judgment against HOGAN.

38. Plaintiff seeks to have this Court a) compel Defendant ST. PAUL to defend them in the MARTONS' Legal Malpractice Action and indemnify Plaintiffs pursuant to the terms of the subject insurance policy and b) reimburse Plaintiffs for all sums expended on legal fees in this action and in defending the MARTONS' Legal Malpractice Action to date, due to the failure of Defendant ST. PAUL to defend and provide coverage under the terms of the subject insurance policy.

**WHEREFORE,** Plaintiffs demand Judgment against Defendant ST. PAUL:

i) declaring that Defendant ST. PAUL is obligated to defend Plaintiffs in the MARTONS' Legal Malpractice Action commenced against them;

ii) declaring that Defendant ST. PAUL is obligated to provide insurance coverage and to indemnify Plaintiffs under the terms of the subject insurance policy in that action;

iii) awarding Plaintiffs a sum to be determined by the Court as reasonable reimbursement for the sums of money Plaintiffs were caused to expend in the prosecution of this action;

iv) awarding Plaintiffs a sum to be determined by the Court as reasonable reimbursement for the sums of money Plaintiffs were caused to expend in the defense of the MARTONS' Legal Malpractice Action as a result of the failure of Defendant ST. PAUL to comply with the terms of the subject insurance policy; and

v) such other and further relief as may be just and proper under the

circumstances herein, including but not limited to the costs and

disbursements of this action.

Dated: New York, N.Y.
      January 18, 2008

LAW OFFICE OF PETER WESSEL, PLLC

By: _____
    PETER WESSEL
CITAK & CITAK, DONALD L. CITAK and
BURTON CITAK
Attorney for Plaintiffs
270 Madison Avenue, Suite 1203
New York, NY 10016
(212) 532-9700

**STATE OF NEW YORK**     )

               : ss.: <u>VERIFICATION</u>

**COUNTY OF NEW YORK**     )

DONALD L. CITAK, ESQ., being duly sworn, deposes, and says that he is

one of the plaintiffs herein, he has read the foregoing Amended Complaint for a

Declaratory Judgment, knows the contents thereof to be true of each of his own

knowledge, except as to matters therein stated to be alleged upon information

and belief, and as to those matters he believes those statements to be true. The

source of his information and the grounds for his belief is communications with

counsel and counsel's investigation of the matter.

_____

DONALD L. CITAK, ESQ.

Sworn to before me this

18th day of January 2008

_____

NOTARY PUBLIC

                   Robert Thaler

              Notary Public, State of New York

                 No. 01TH6131025

               Qualified in New York County

            Commission Expires July 25, 2009

LAW OFFICE OF PETER WESSEL, PLLC • 270 Madison Avenue, Suite 1203 • New York, N.Y. 10016-0601 • 212-532-9700

# EXHIBIT "1"


**ST PAUL TRAVELERS**

St Paul Travelers 1st Choice℠ for Lawyers

# LAWYERS PROFESSIONAL LIABILITY POLICY

A Custom Insurance Policy Prepared for:

**Citak & Citak**
**Attorneys at Law**

LA000 Ed. 6-04  Printed in U.S.A.
© 2004 The St. Paul Travelers Companies, Inc.  All Right Reserved

St. Paul Travelers 1st Choice℠ for Lawyers

**ST PAUL TRAVELERS**

**LAWYERS PROFESSIONAL LIABILITY
DECLARATIONS PAGE**

---

POLICY NUMBER: 507JB0670          ISSUE DATE: 03/27/2006

### THIS IS A CLAIMS-MADE POLICY. PLEASE READ IT CAREFULLY.

INSURING COMPANY:      St. Paul Fire and Marine Insurance Company, St. Paul, Minnesota

1. **NAMED INSURED:**      Citak & Citak
   Attorneys at Law

2. **PRINCIPAL ADDRESS:**   270 Madison Avenue, Suite 1203
   New York, NY 10016

3. **POLICY PERIOD:**      From: 04/28/06          To: 04/28/07
   Inception                Expiration
   (12: 01 A. M. Standard Time at the Principal Address Stated Above)

4. **LIMITS OF LIABILITY:**   $ 1,000,000  **EACH CLAIM**
   $ 1,000,000  **POLICY AGGREGATE**
   "Claims Expenses" are in addition to the Limits of Liability.

5. **DEDUCTIBLE:**         $ 5,000 **EACH CLAIM**
   $ N/A  **POLICY AGGREGATE**
   Deductible Applies to Indemnity only.

6. **PREMIUM:**            $ 7,038.00

7. **RETROACTIVE DATE:**   FULL

8. **FORM AND ENDORSEMENT NUMBERS ATTACHING TO THIS POLICY AT ISSUANCE:**

   SEE ATTACHED FORMS LIST #40705

This policy consists of the Lawyers Professional Liability Declarations, Coverage Form, Endorsements
listed above (or attached after inception) and the Application and any applicable supplements or
attachments.

LA002 Ed. 12-04 Printed in U.S.A.
© 2004 The St. Paul Travelers Companies, Inc. All Right Reserved

**NAME AND ADDRESS OF PRODUCER:**

JLT Services Corporation
13 Cornell Rd
Latham NY 12110

_Patricia A. Wilson_

Authorized Representative

In Witness Whereof, the Insurer has caused this policy to be signed by its President and Secretary and countersigned on the Declarations Page by a duly authorized agent of the Insurer.

_Jay S. Fishman_
President

_Secretary_

# NEW YORK - LAWYERS PROFESSIONAL LIABILITY COVERAGE FORM

## NOTICE - THIS IS A CLAIMS-MADE POLICY WITH "CLAIMS EXPENSES" IN ADDITION TO THE LIMITS OF LIABILITY.  PLEASE READ IT CAREFULLY.

THIS IS A CLAIMS-MADE POLICY.  IF THE POLICY CONTAINS A RETROACTIVE DATE, THEN THE POLICY PROVIDES NO COVERAGE FOR "CLAIMS" FOR ANY ERROR, OMISSION, NEGLIGENT ACT OR "PERSONAL INJURY" IN THE RENDERING OR FAILURE TO RENDER "PROFESSIONAL LEGAL SERVICES" COMMITTED PRIOR TO THE POLICY INCEPTION DATE OR THE RETROACTIVE DATE.  THIS POLICY APPLIES ONLY TO "CLAIMS", OR CIRCUMSTANCES REPORTED IN ACCORDANCE WITH SECTION IX-CONDITIONS B, FIRST MADE AGAINST THE INSUREDS DURING THE "POLICY PERIOD", ANY SUBSEQUENT RENEWAL OF THE POLICY OR APPLICABLE EXTENDED REPORTING PERIOD AND REPORTED IN WRITING TO US PURSUANT TO THE TERMS HEREIN.  THE LIMIT OF LIABILITY AVAILABLE TO PAY "DAMAGES" OR SETTLEMENTS SHALL NOT BE REDUCED BY AMOUNTS INCURRED AS "CLAIMS EXPENSES".  ANY "CLAIMS EXPENSES" THAT ARE INCURRED SHALL NOT BE APPLIED AGAINST THE APPLICABLE RETENTION.  WE SHALL HAVE THE RIGHT AND DUTY TO DEFEND ANY "CLAIM" AGAINST THE INSUREDS UNDER THIS POLICY.

COVERAGE FOR THE POLICY CEASES UPON TERMINATION OF COVERAGE EXCEPT FOR THE BASIC EXTENDED REPORTING PERIOD, UNLESS A SUPPLEMENTAL EXTENDED REPORTING PERIOD IS PURCHASED.  POTENTIAL COVERAGE GAPS MAY ARISE UPON EXPIRATION OF THE SUPPLEMENTAL EXTENDED REPORTING PERIOD.  IN GENERAL, THE NATURE OF CLAIMS-MADE COVERAGE IS SUCH THAT, DURING THE FIRST SEVERAL YEARS OF THE "CLAIMS-MADE RELATIONSHIP", CLAIMS-MADE RATES ARE GENERALLY LOWER THAN OCCURRENCE RATES (ASSUMING THAT COVERAGE ON AN OCCURRENCE BASIS IS AVAILABLE FOR THE INSURANCE IN QUESTION), AND YOU MAY EXPECT SUBSTANTIAL ANNUAL PREMIUM INCREASE, INDEPENDENT OF OVERALL RATE LEVEL INCREASES, UNTIL THE "CLAIMS-MADE RELATIONSHIP" REACHES MATURITY.

Throughout the policy the words "you" and "your" refer to the "Named Insured" shown in the Declarations.  The words "we", "us", and "our" refer to the Company providing this insurance.

The word "insured" means any person or organization qualifying as such under **SECTION II – INSURED.**

Other words and phrases that appear in quotation marks have special meaning.  Refer to **SECTION VIII –DEFINITIONS.**

## SECTION I - INSURING AGREEMENTS

We will pay on behalf of an insured "damages" and "claims expenses" for which "claim" is first made against an insured and reported to us within the "policy period", any subsequent renewal of the policy by us or applicable Extended Reporting Period. Such "damages" must arise out of an error, omission, negligent act or "personal injury", in the rendering of or failure to render "legal services" for others by you or on your behalf.  The error, omission, negligent act or "personal injury" must occur on or after the retroactive date stated in the Declarations, if any.

We will have the right and duty to defend any "claim" or "suit" against an insured seeking "damages" to which this insurance applies, even if any of the allegations of the "claim" or "suit" are groundless, false or fraudulent.  We may also make such investigation and, with your written consent, such settlement of any "claim" or "suit" we deem appropriate.

If an insured does not agree with a settlement recommended by us, our Limit of Liability is reduced to the total of the amount for which the "claim" or "suit" could have been settled plus all "claims expenses" incurred up to the time we made

LAWYERS PROFESSIONAL LIABILITY COVERAGE FORM
Case 1:07-cv-05459-WHP    Document 25-2    Filed 02/08/2008    Page 22 of 31
Case 1:07-cv-05459-WHP    Document 23-2    Filed 01/22/2008    Page 1 of 15

our recommendation. We shall have the right to withdraw from further defense of the "claim" or proceeding by tendering control of said defense over to you.

We will not be obligated to pay "damages" or "claims expenses" or to defend any "claim" or "suit" after the applicable Limit of Liability has been exhausted by payment made by us towards judgments and/or settlements.

## SECTION II – INSURED

Each of the following is an insured:

A. The "Named Insured" shown in the Declarations; and

B. Any person who was, is now or hereafter becomes a partner, officer, director, employee, principal, shareholder or member of the "Named Insured", whether named or not, but only while acting in the scope of their duties as such; and

C. Any lawyer retained as Of Counsel by you, but only with respect to "professional legal services" performed for you or on your behalf or on behalf of a "predecessor firm"; and

D. The estate, heirs, executors, administrators, and legal representatives of any insured in the event of such insured's death, incapacity, insolvency or bankruptcy, but only to the extent that such insured would otherwise be provided coverage under this policy; and

E. Any "predecessor in business" or person who was a partner, officer, director, employee, principal, shareholder or member of any "predecessor in business" who provided "professional legal services" on behalf of any "predecessor in business", provided a request for such coverage is made to us and accepted in writing prior to the inception of such coverage; and

F. Any organization you newly acquire or form is an insured under this policy only when we provide you our written acceptance. This provision applies to any partner, officer, director, employee, principal, shareholder or member of such newly acquired or formed organization.

## SECTION III – LIMITS OF LIABILITY

Regardless of the number of insureds under this policy, the number of persons or organizations seeking "damages" or the number of "claims" made, our liability is limited as follows:

A. The amount stated in the Declarations as applicable to each "claim" is the most we will pay for all "damages" arising out of the same or related errors, omissions, negligent acts or "personal injury". For the purposes of determining our Limit of Liability, all "claims" arising out of the same or related errors, omissions, negligent acts or "personal injury" will be deemed to have been made when the first of such "claims" is made whether such demands are made against one or more insureds or whether such demands are made by one or more persons and will be treated as a single "claim".

B. The amount shown in the Declarations as Policy Aggregate is the most we will pay for all "damages" for all "claims" to which this insurance applies.

## SECTION IV – DEDUCTIBLE

A. Our obligation to pay "damages" under this policy applies only to the amount of "damages" which are in excess of the Deductible amount stated in the Declarations.

B. The deductible amount applies to all "damages" incurred as the result of each "claim". The deductible amount does not apply to "claims expenses" incurred as the result of each "claim".

C. The terms of the policy, including those with respect to our right and duty to defend "suits" and your duties in the event of a "claim", "suit" or circumstances which may give rise to a "claim", apply irrespective of the application of the deductible.

D. We may pay any part or all of the deductible amount. Upon notification of the action we have taken, you shall reimburse us for such part of the deductible amount as we have paid.

E. The Limits of Liability will not be reduced by the amount of any "damages" within the deductible amount.

LAWYERS PROFESSIONAL LIABILITY COVERAGE FORM
Case 1:07-cv-05459-WHP    Document 25-2    Filed 02/08/2008    Page 23 of 31
Case 1:07-cv-05459-WHP    Document 23-2    Filed 01/22/2008    Page 2 of 15

## SECTION V – SUPPLEMENTARY PAYMENTS

We will pay, in addition to the applicable Limit of Liability:

A. All "claims expenses" in connection with any "claim" or "suit" we defend.

B. All costs charged against any insured in such "claims" or "suits".

C. All interest on the entire amount of any judgment which accrues after entry of the judgment and before we have paid, offered to pay or deposited, whether in court or otherwise, that part of the judgment which does not exceed our Limit of Liability.

D. Prejudgment interest against any insured on that part of the judgment we pay. If we make an offer to pay the applicable Limit of Liability, we will not pay any pre-judgment interest based on that period time after the offer.

E. Premiums on appeal bonds and premiums on bonds to release attachments but not for bond amounts in excess of the applicable Limit of Liability.

F. All reasonable expenses incurred by the insured at our request to assist us in the investigation of the "claim" or "suit", including actual loss of earnings up to $250 a day for each insured because of time off from work, subject to a limit of $5,000 for each individual insured subject to a maximum limit of $10,000 per "policy period".

G. All reasonable legal expenses incurred by the insured resulting from the defense of a proceeding by a regulatory or disciplinary official or agency to investigate charges of professional misconduct in the rendering of or failure to render "professional legal services" subject to a limit of $5,000 per "policy period".

## SECTION VI – POLICY TERRITORY

This policy applies worldwide, provided that "claim" is made and "suit" is brought within the United States of America (including its territories or possessions), Puerto Rico or Canada.

## SECTION VII – EXCLUSIONS

This insurance does not apply to "claims":

A. Arising out of any dishonest, fraudulent, criminal or malicious act, error, omission or "personal injury" committed by, at the direction of, or with the knowledge of an insured. This exclusion does not apply to an insured who did not personally commit or personally participate in committing any of the knowingly wrongful acts, errors, omissions or "personal injury", provided that:

   1. Such insured had neither notice nor knowledge of such knowingly wrongful act, error, omission or "personal injury"; and

   2. Such insured, upon receipt of notice or knowledge of such knowingly wrongful act, error, omission or "personal injury", notifies us as soon as possible.

B. Arising out of "bodily injury" or "property damage".

C. Made by one insured under this policy against another insured under this policy.

D. Alleging discrimination.

E. Arising out of any insured's activities and/or capacity as a fiduciary under The Employee Retirement Income Security Act of 1974 as amended, or similar responsibility under state statutory or common law; except if the insured is deemed to be a fiduciary solely by reason of "professional legal services" rendered with respect to any employee benefit plan.

F. Based upon or arising out of any insured's capacity as:

   1. A public official or employee of a governmental body, subdivision or agency thereof unless the insured is deemed to be such solely by virtue of rendering "professional legal services" to such governmental body, the remuneration for which services inures to the benefit of the "Named Insured"; or

   2. An officer, director, partner, employee, principal, shareholder or member of any organization other than the "Named Insured" or any "predecessor in business".

G. Arising out of any error, omission, negligent act or "personal injury" occurring prior to the inception date of this policy if any insured prior to the inception date knew or could have reasonably foreseen that such error, omission, negligent act or "personal injury" might be expected to be the basis of a "claim" or "suit".

H. Arising out of:

1. The promotion, sale or solicitation for sale of securities, real estate, or other investments by any insured; or

2. Recommendations, representations or opinions concerning specific investment advice by any insured or any person or organization referred to by any insured in connection with portfolio or trust account management, or the performance or nonperformance of securities, real estate, or other investments.

I. Arising out of "professional legal services" performed for or on behalf of any organization other than the "Named Insured" or any "predecessor in business" at any time when those services were performed the organization was:

1. Directly or indirectly controlled, operated or managed by any insured; or

2. Owned by any insured, or by a spouse of any insured, in a percentage which exceeds:

   a. 5% of the issued and outstanding voting stock of the shares of a publicly traded organization; or

   b. 10% of the shares of a closely or privately held organization.

J. Against any insured as a beneficiary or distributee of any trust or estate.

K. Arising out of liability assumed by any insured under any indemnity, hold harmless or similar provisions or agreements, but this exclusion does not apply to liability an insured would have in the absence of such agreements.

L. Arising out of the inability or failure to pay, collect, administer or safeguard funds held or to be held for others.

M. Arising out of the alleged notarized certification or acknowledgment by any insured, in their capacity as a notary public, of a signature on a document which the insured did not witness being placed on the document.

N. Arising solely out of an error, omission, negligent act or "personal injury" of a lawyer with whom you share or shared common office space or common office facilities and who is or was not an insured under this policy.

## SECTION VIII — DEFINITIONS

A. "Bodily Injury" means bodily injury, sickness or disease sustained by a person, including the death of any person, resulting at any time. "Bodily injury" includes mental anguish and emotional distress.

B. "Claim" means a demand received by an insured for money alleging an error, omission or negligent act in the rendering of or failure to render "professional legal services" for others by you or on your behalf.

C. "Claims Expense" means reasonable and necessary fees charged by (an) attorney(s) designated or approved in writing by us and all other fees, costs, and expenses resulting from the investigation, adjustment, defense and appeal of a "claim", "suit" or proceeding arising in connection therewith, if incurred by us or by an insured with our written consent.

D. "Claims-Made Relationship" means that period of time between the Inception Date of the first claims-made policy between you and us, without any gap of coverage, but does not include any period covered by an Extended Reporting Period.

E. "Damages" means compensatory damages which an insured becomes legally obligated to pay as a result of any judgment, award or settlement, provided any settlement is negotiated with the assistance and approval of us. "Damages" does not include punitive or exemplary damages, fines, sanctions or penalties, equitable relief or the return or reimbursement of fees for "professional legal services" whether or not rendered.

F. "Named Insured" means the person or entity as stated in the Declarations.

LAWYERS PROFESSIONAL LIABILITY COVERAGE FORM
Case 1:07-cv-05459-WHP   Document 25-2   Filed 02/08/2008   Page 25 of 31
Case 1:07-cv-05459-WHP   Document 23-2   Filed 01/22/2008   Page 4 of 15

G. "Personal Injury" means injury, other than "bodily injury", arising out of one or more of the following offenses:

1. False arrest, detention or imprisonment; or

2. Malicious prosecution; or

3. The wrongful eviction from, wrongful entry into, or the invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor; or

4. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

5. Oral or written publication of material that violates a person's right of privacy.

H. "Policy Period" means the period from the inception date of this policy to the policy expiration date, as set forth in the Declarations, or the date of cancellation, whichever is earlier.

I. "Predecessor in Business" means a law firm or practice which has undergone dissolution and at least 50% of the owners, officers, partners, principals or shareholders of the prior firm have joined you.

J. "Professional Legal Services" means services performed or advice given by you or on your behalf for others in the conduct of your practice as a lawyer, real estate title insurance agent, notary public, arbitrator or mediator. It includes services performed for others ordinarily rendered by a lawyer as an administrator, conservator, executor, guardian, trustee, receiver, or in any other similar fiduciary capacity and then only for such services. It does not include services performed or advice given while acting in the capacity of an employee, officer, director, partner, shareholder, principal, investor, member, agent or in any other capacity that gives rise to a conflict of interest of any organization other than the "Named Insured" or any "predecessor in business".

K. "Property Damage" means:

1. Physical injury to tangible property, including all resulting loss of use of that property; or

2. Loss of use of tangible property that is not physically injured.

L. "Suit" means a civil proceeding in which "damages" to which this insurance applies are alleged. "Suit" includes:

1. An arbitration proceeding in which such "damages" are claimed and to which an insured must submit or does submit with our consent; or

2. Any other alternative dispute resolution proceeding in which "damages" are claimed and to which an insured submits with our consent.

## SECTION IX — CONDITIONS

A. Extended Reporting Periods

CONDITION A. Extended Reporting Periods, will not apply to this policy, except for the automatic 60 Day Basic Extended Reporting Period described in Paragraph 1 below, if the "claims-made relationship" between you and the Company has been less than one year and the policy has been terminated for nonpayment of premium or fraud.

1. In the event of any termination of coverage which is defined as:

a. Cancellation; or

b. Nonrenewal; or

c. Decrease in the Limits of Liability; or

d. Reduction of coverage; or

e. Increased deductible; or

f. New exclusion; or

g. Any other change in coverage which is less favorable to the insured;

An automatic 60 Day Basic Extended Reporting Period will be furnished to the insured for reporting any "claim" first made against the insured arising out of an error, omission, or negligent act to which this coverage applies and which occurred after any retroactive date, if any, and prior to the end of the "policy period". Any "claims" reported under this 60 Day Basic Extended Reporting Period will

LAWYERS PROFESSIONAL LIABILITY COVERAGE FORM
Case 1:07-cv-05459-WHP   Document 25-2   Filed 02/08/2008   Page 26 of 31
Case 1:07-cv-05459-WHP   Document 23-2   Filed 01/22/2008   Page 5 of 15

be considered as having been made before the end of the "policy period". The 60 Day Basic Extended Reporting Period coverage is excess over any other valid and collectible insurance available to any insured.

The 60 Day Basic Extended Reporting Period does not increase our Limits of Liability. The Limit of Liability for the 60 Day Basic Reporting Period will be the amount of coverage remaining in the Aggregate Limit of Liability of the terminated policy.

2. You will also have the right to purchase a Supplemental Extended Reporting Period. Upon payment of the additional premium, we will issue an endorsement providing a three (3) year Supplemental Extended Reporting Period, inclusive of the 60 Day Basic Extended Reporting Period specified in Paragraph 1 above. This endorsement will cover "claims" first made during the Supplemental Extended Reporting Period for errors, omissions or negligent acts which occurred prior to the end of the "policy period" and are otherwise covered by the policy. The additional premium for this Supplemental Extended Reporting Period will be 190% of the policy's last annual premium. This Supplemental Extended Reporting Period coverage is excess over any other valid and collectible insurance available to any insured.

3. Not later than thirty (30) days after the termination of coverage, we will mail or deliver to the first "Named Insured" in Item 1 of the Declarations, written notice of the Basic Extended Reporting Period, and the availability of, the premium for, and the importance of purchasing the Supplemental Extended Reporting Period. Proof of mailing or delivery, shall be sufficient proof of notice.

The first "Named Insured" will have the greater of sixty (60) days from the effective date of termination of coverage, or thirty (30) days from the date of mailing or delivery of the notice of the availability to purchase the Supplemental Extended Reporting Period, to submit written

acceptance of, and premium for, the Supplemental Extended Reporting Period to us.

4. If this policy or continuous claims-made policy's, issued on behalf of the Company, have been in effect for less than three (3) years, the amount of coverage afforded under the Supplemental Extended Reporting Period shall be the greater of the amount of coverage remaining in the policy's Annual Aggregate Limit of Liability or fifty percent (50%) of the policy's Annual Aggregate Limit of Liability.

If this policy or continuous claims-made policies, issued on behalf of the Company, have been in effect for three (3) years or more, the amount of coverage will be equal to 100% of the policy's Annual Aggregate Limit of Liability.

5. If you become totally and permanently disabled or die during the "policy period", the period for reporting "claims" is extended until your disability ends or the executor or administrator is discharged.

No additional premium will be charged for this extension nor will any premium be refunded.

We also require one of the following, within 60 days after the end of this policy, for this coverage to apply:

a. Written proof of your permanent and total disability, including the date it happened, certified by your attending physician. You agree to submit to medical examination(s) by any physician(s) we designate if requested; or

b. Written proof of the date of your death.

6. During a "claims-made relationship" and any Extended Reporting Period, a person employed or otherwise affiliated with you and covered by your claims-made policy during such affiliation will continue to be covered under such policy and any Extended Reporting Period after the affiliation has ceased, for such

LAWYERS PROFESSIONAL LIABILITY COVERAGE FORM
Case 1:07-cv-05459-WHP    Document 25-2    Filed 02/08/2008    Page 27 of 31
Case 1:07-cv-05459-WHP    Document 23-2    Filed 01/22/2008    Page 6 of 15

person's errors, omissions or negligent acts performed on your behalf during the affiliation with you.

If this policy was issued to a corporation or partnership, we will provide an Individual Extended Reporting Period coverage upon termination of coverage to any person covered under the policy if:

a. Such entity has been placed in liquidation or bankruptcy or permanently ceases operations; and

b. The entity or its designated entity does not purchase Extended Reporting coverage; and

c. Such person requests the Individual Extended Reporting Period within 120 days of termination of coverage.

We will not be obligated to provide any notice to any person of the availability of the Extended Reporting Periods coverage other than to the first "Named Insured".

B. Reporting of Circumstances Which May Give Rise to a "Claim"

If, during the "policy period", any insured first becomes aware of a circumstance which may give rise to a "claim" (i.e., any act, error, omission or "personal injury" which might reasonably be expected to be the basis of a "claim" against any insured under this policy), the insured must give written notice in accordance with SECTION IX –CONDITIONS C. Insured's Duties in the Event of a "Claim", "Suit" or Circumstances Which May Give Rise to a "Claim". Any "claims" subsequently made against any insured arising out of that circumstance shall be considered to have been made and reported during the "policy period".

C. Insured's Duties in the Event of a "Claim", "Suit" or Circumstances Which May Give Rise to a "Claim"

1. You and another involved insured must see to it that we are notified in writing as soon as practicable and within the "policy period", any subsequent renewal of the policy by us or any applicable Extended

Reporting Period of any circumstance which may give rise to a "claim". To the extent possible, written notice should include:

a. The specific act, error, omission or "personal injury" including the date(s) thereof; and

b. The "damages" that may reasonably result; and

c. The date and circumstances by which any insured became aware of the act, error, omission or "personal injury".

2. If a "claim" is received by any insured you must:

a. Immediately record the specifics of the "claim" and the date received ; and

b. Notify us as soon as practicable.

You and any other involved insured must see to it that we receive written notice of the "claim" as soon as practicable and within the "policy period", any subsequent renewal of the policy or applicable Extended Reporting Period.

3. You and any other involved insured must:

a. Immediately send us copies of any demands, notices, summons' or legal papers received in connection with the "claim" or "suit"; and

b. Authorize us to obtain records and other information; and

c. Cooperate with us in the investigation, settlement or defense of the "claim" or "suit"; and

d. Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to any insured because of "damages" to which this insurance may also apply.

4. No insured will, except at their own cost, voluntarily make a payment,

LAWYERS PROFESSIONAL LIABILITY COVERAGE FORM

Case 1:07-cv-05459-WHP    Document 25-2    Filed 02/08/2008    Page 28 of 31
Case 1:07-cv-05459-WHP    Document 23-2    Filed 01/22/2008    Page 7 of 15

assume any obligation, or incur any expense without our written consent.

5. Notice given by or on behalf of an insured, or written notice by or on behalf of the injured person or any other claimant, to any agent of ours in New York State, with particulars sufficient to identify the insured, shall be considered to be notice to us.

D. Transfer of Right of Recovery Against Others

If an insured has rights to recover all or part of any payment we have made under this policy, those rights are transferred to us. Such insured must do nothing after a "claim" is made or "suit" is brought to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

Failure to comply with this CONDITION D will not in itself impair coverage, provided that the insured against whom "claim" is made or "suit" is brought did not personally impair rights of recovery or have knowledge of such impairment. Furthermore, upon receipt of such knowledge, such insured must immediately notify us that those rights have been impaired.

E. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first "Named Insured" shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policies' terms can be amended or waived only by an endorsement issued by us as part of this policy.

F. Legal Action Against Us

No person or organization has a right under this policy:

1. To join us as a party or otherwise bring us into a "claim" or "suit" asking for "damages" from an insured; or

2. To sue us on this policy unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for "damages" that are not payable under the terms of this policy or that are in excess of the applicable Limit of Liability. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

G. Bankruptcy

Bankruptcy or insolvency of any insured or of an insured's estate will not relieve us of our obligations under this policy.

H. Cancellation

1. The first "Named Insured" may cancel this policy by:

   a. Surrendering the policy to us or any of our authorized agents; or

   b. Mailing to us written notice stating when thereafter the cancellation shall be effective.

2. Cancellation of Policies in Effect 60 Days or Less

   This policy may be cancelled by us by mailing or delivering to the first "Named Insured" written notice stating the reason for cancellation at the mailing address shown in the policy, and the authorized agent or broker at least:

   a. 30 days before the effective date of cancellation if the policy is cancelled for any reason not included in Paragraph b below.

   b. 15 days before the effective date of cancellation if the policy is cancelled for any of the following reasons:

      (1) Nonpayment of premium (if we cancel for this reason, the notice will include the amount due); or

      (2) Conviction of a crime arising out of acts increasing the hazard insured against; or

LAWYERS PROFESSIONAL LIABILITY COVERAGE FORM
Case 1:07-cv-05459-WHP   Document 25-2    Filed 02/08/2008   Page 29 of 31
Case 1:07-cv-05459-WHP   Document 23-2    Filed 01/22/2008   Page 8 of 15

(3) Discovery of fraud or material misrepresentation in the obtaining of this policy or in the presentation of a "claim" thereunder; or

(4) After issuance of the policy or after the last renewal date, discovery of an act or omission, or a violation of any policy condition, that substantially and materially increases the hazard insured against, and which occurred subsequent to inception of the current "policy period"; or

(5) Material change in the nature or extent of the risk, occurring after issuance or last annual renewal anniversary date of the policy, which causes the risk of loss to be substantially and materially increased beyond that contemplated at the time the policy was issued or last renewed; or

(6) Required pursuant to a determination by the Superintendent that the continuation of our present premium volume would jeopardize our solvency or be hazardous to the interest of our policyholders, our creditors or the public; or

(7) A determination by the Superintendent that the continuation of the policy would violate, or would place us in violation of, any provision of the Insurance Code; or

(8) Revocation or suspension of the insured's license to practice his/her profession.

3. Cancellation of Policies in Effect for More Than 60 Days

If this policy has been in effect for more than 60 days, or if this policy is a renewal or continuation of a policy issued by us, this policy may be cancelled by us only for any of the reasons listed in 2, above, provided we mail written notice of cancellation stating the reason for

cancellation to the first "Named Insured" at the address shown in the policy and to the authorized agent or broker at least 15 days before the effective date of cancellation.

4. Notice of cancellation will state the effective date of cancellation. If the policy is cancelled, that date will become the end of the "policy period".

5. If the first "Named Insured" cancels, earned premium will be computed in accordance with the customary short rate table and procedure. If we cancel, earned premium shall be computed pro rata.

However, when the premium is advanced under a premium finance agreement, the cancellation refund will be pro rata. Under such financed policies, the company will be entitled to retain a minimum earned premium of 10% of the total policy premium or $60, whichever is greater. Premium adjustment may be made either at the time cancellation is effected or as soon as practicable after cancellation becomes effective. Payment or tender of unearned premium is not a condition of cancellation.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

I. Nonrenewal or Conditional Renewal

1. Nonrenewal

If we decide not to renew this policy we will mail or deliver written notice of nonrenewal to the first "Named Insured" as provided in Paragraph I, 3, below, along with the specific reason(s) for nonrenewal.

2. Conditional Renewal

If we condition renewal of this policy upon:

a. Change of limits; or

b. Change in type of coverage; or

c. Reduction of coverage; or

d. Increased Deductible; or

LAWYERS PROFESSIONAL LIABILITY COVERAGE FORM
Case 1:07-cv-05459-WHP    Document 25-2    Filed 02/08/2008    Page 30 of 31
Case 1:07-cv-05459-WHP    Document 23-2    Filed 01/22/2008    Page 9 of 15

e. Addition of an exclusion; or

f. Increased premiums in excess of 10%, exclusive of any premium increase due to and commensurate with insured value added or increased exposure units; or as a result of experience rating or audit;

We will send, mail or deliver written notice of conditional renewal as provided in Paragraph 3 below stating renewal premium and specific reason(s) for the conditional renewal.

3. Notices of Nonrenewal and Conditional Renewal

   a. If we decide not to renew this policy or to conditionally renew this policy as provided in Paragraphs 1, 1, and 1, 2, above, we shall mail or deliver written notice to the first "Named Insured" at least 60 but not more than 120 days before:

      (1) The Expiration Date; or

      (2) The anniversary date if this is a continuous policy.

   b. Notice will be mailed or delivered to the first "Named Insured" at the address shown in the policy and to the authorized agent or broker. If notice is mailed or delivered, proof of mailing or delivery, will be sufficient proof of notice.

   c. We will not send the first "Named Insured" notice of nonrenewal or conditional renewal if the "Named Insured", the authorized agent or broker or another insurer of the "Named Insured" mails or delivers notice that the policy has been replaced or is no longer desired.

4. Late Notice of Conditional Renewal or Nonrenewal

   a. If prior to the expiration of this policy, we send an incomplete or late conditional renewal notice or a late or incomplete nonrenewal notice as provided for in Paragraph I, 3, above, coverage

will remain in effect at the same terms and conditions of this policy and at the lower of the current rates or the prior period's rates until sixty (60) days after such notice is mailed or delivered, unless you elect to cancel sooner.

   b. If we do send the first "Named Insured" notice of nonrenewal or conditional renewal until on, or after the expiration of the current coverage, coverage will remain in effect on the same terms and conditions of the expiring policy for another "policy period" and at the lower of the current rates or the prior period's rates, unless the insured notifies us during the additional "policy period" coverage has been replaced or elects to cancel, in which event cancellation shall be on a pro rata basis.

   c. The Aggregate Limit of this policy as shown in the Declarations will be increased in proportion to any policy extension provided in accordance with Paragraphs 4, a, and 4, b, above.

J. Conformity to Statute

   The terms of this policy which are in conflict with the statutes of the state wherein this policy is delivered are hereby amended to conform to such statute.

K. Transfer of Your Rights and Duties Under This Policy

   Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual "Named Insured".

   If you die, your rights and duties will be transferred to your legal representative, but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have rights and duties, but only with respect to that property.

L. Other Insurance

This insurance, including any applicable Extended Reporting Period coverage, is excess over any other valid and collectible insurance available to any insured.

M. Examination of Your Books and Records

You must keep accurate records of the information we will need to compute your premium. You agree to allow us to examine and audit your financial books and records that relate to this insurance. We may do this within one hundred and eighty (180) days after expiration of this policy.

We may as soon as practicable following such audit, refund or credit your account for any return premium due you, or bill and make a good faith effort to collect any additional premium due us, as a result of such audit.

If you fail to cooperate with us in our attempt to conduct an audit, including your failure to return any questionnaires or self-audit worksheets, we shall have the right to not renew your policy upon expiration of the current policy due to our inability to establish your proper premium.

N. Transfer of Duties When a Limit of Insurance is Used Up

1. If we conclude that based on the "claims", or "suits" which have been reported to us and to which this insurance may apply, that the Annual Aggregate Limit of Liability is likely to be used up in the payment of judgments or settlements, we will notify the first "Named Insured" in Item 1 of the Declarations, in writing, to that effect.

2. When the Annual Aggregate Limit of Liability has actually been used up in the payment of judgments or settlements:

   a. We will notify the first "Named Insured", in writing, as soon as practicable, that:

      (1) Such limit has actually been used up; and

      (2) Our duty to defend "suits" seeking "damages" subject to

the Annual Aggregate Limit has also ended.

   b. We will initiate, and cooperate in, the transfer of control, to any appropriate insured, of all "claims" and "suits" seeking "damages" which are subject to the Annual Aggregate Limit and which are reported to us before the limit is used up. That insured must cooperate in the transfer of control of said "claims" and "suits".

   We agree to take such steps, as we deem appropriate, to avoid a default in, or continue the defense of, such "suits" until such transfer is completed, provided the appropriate insured is cooperating in completing such transfer.

   c. The first "Named Insured" in Item 1 of the Declarations, and any other insured involved in a "suit" seeking "damages" subject to the Annual Aggregate Limit, must arrange for the defense of such "suit" within such time period as agreed to between the appropriate insured and us. Absent any such agreement, arrangement for the defense of such "suit" must be made as soon as practicable.

3. The first "Named Insured" in Item 1 of the Declarations will reimburse us for expenses we incur in taking those steps we deem appropriate in accordance with Paragraph 2, b, above.

4. The exhaustion of the Annual Aggregate Limit of Liability by the payments of judgments or settlements, and the resulting end of our duty to defend will not be affected by our failure to comply with any of the provisions of this CONDITION N.

O. Premiums and Premium Audit

1. All premiums for this policy are computed in accordance with our rules and rates.

2. If the Premium in Item 6 of the Declarations, is shown as adjustable