# EXHIBIT F

*Citak & Citak*
*Attorneys at Law*

*Burton Citak*
*Donald L. Citak*
*Erik Raines*

RECEIVED

2006 FEB -9  A 11: 15    *270 Madison Avenue, New York, N.Y. 10016*

*(212) 759-9585 / (800) 724-9585*

*Fax (212) 759-2979*

DEPUTY
COUNSEL

E-mail: dcitak@citaklaw.com
bcitak@citaklaw.com
eraines@citaklaw.com

February 8, 2006

Departmental Disciplinary Committee
Supreme Court, Appellate Division, First Judicial Department
61 Broadway
New York, NY 10006

> Re:        Complaint of Mr. Stuart Marton against Attorney Donald L. Citak
> Docket #:    2005.3319

To the Honorable Committee:

By this letter, supported by the annexed exhibits, I formally respond to the complaint filed by Stuart Marton with this Committee, which are contained in his statement dated December 21, 2005. This response is timely filed prior to February 13, 2006, following the extension of time granted to the undersigned by the Committee through its Legal Assistant, Joel Peterson, as confirmed in our January 27, 2006 letter.

My educational and professional background is as follows: I am a graduate of Wesleyan University (BA '77) and Hofstra University School of Law (JD '80), where I was Managing Editor of the Hofstra Law Review. Following graduation, I worked for the law firm then known as Rosenman Colin Freund Lewis & Cohen. I was admitted to the New York Bar in February 1981 and am admitted to practice in the Federal courts (Southern, Eastern Districts, 2nd Circuit) . In the summer 1982, I left the Rosenman firm and began working with my father, Burton Citak, a solo practitioner. In January 1983, we formed the partnership of Citak & Citak and have been practicing law together under that name since then. From January 1983 until August 2002, our offices were located at 18 East 48th Street, at which time we moved to our present address, 270 Madison Avenue.

During the 25 years in which I have engaged in the practice of law in New York, primarily focusing on civil litigation, I have never been the subject of any attorney discipline.

The Complaint filed by Stuart Marton alleges i) that his entire litigation process was too slow and had many delays; ii) that he was never informed that his matter was not accepted for arbitration before the AAA, after the Supreme Court (New York County, by J. Madden) had dismissed the Complaint filed on his behalf; and iii) that I failed to respond to his communication.

There is no merit to Mr. Marton's allegations. Mr. Marton did not "hire' us in April 2000; rather we were retained to commence a proceeding on his behalf by written agreement in July 2002. Prior thereto, Mr. Marton had not decided to commence litigation and did not engage us to do so. After being retained and commencing litigation, certain difficulties were encountered (i.e., effecting proper service upon the defendant at the address provided to us by Mr. Marton, loss of motion papers by the Court). But the litigation commenced on Mr. Marton's behalf was never intentionally or unduly delayed and we did not fail to communicate with Mr. Marton in any way. After the Supreme Court dismissed the Complaint in October 2003, we understood that Mr. Marton did not wish us to proceed further. He had failed to remit requested disbursements to commence an arbitration proceeding when requested to do so by our written letter to him in November 2003; he cancelled a scheduled appointment to come to our office in December 2003, advising us that he would contact us in the future. He did not re-scheduled that appointment. We presumed his matter to be closed. Thereafter, there was no further communication (letter, fax, email, telephone call) from Mr. Marton or anyone on his behalf to us and the matter was closed since he did not wish to proceed.

Background

In May 2000, Mr. Marton contracted with Hogan Contracting, Inc. (Hogan Contracting") of Hartsdale, NY, a small contracting company, wholly owned by its principal, Frank Hogan, to undertake a project that principally involved combining two (2) cooperative apartments, #14E and #14F, owned by Mr. Marton and his wife at 200 East 27th Street, NYC 10016, into one (1) unit, and renovating certain portions thereof. There is no dispute that neither Citak & Citak nor I was involved in any way in the discussions and negotiations that Mr. Maton entered into with Hogan Contracting in April 2000 or in the preparation of the contract that was ultimately signed between them that month. [1]

In connection with this project, Mr. Marton hired his own architect, Ann Krsul, of Ann Krsul Architecture, 160 Fifth Avenue, NYC. Neither Citak & Citak nor I was involved in any way with the hiring of this architect by Mr. Marton or any of the services that she rendered on Mr. Marton's behalf.

---

[1] Mr. Marton incorrectly states that Citak & Citak was retained "in April 2000". Absolutely no dispute existed at that time. Mr. Marton's contract with Hogan Contracting was first signed in May 2000 for a project that commenced thereafter during the summer 2000.

The contract that Mr. Marton signed with Hogan Contracting was AIA Document A101-1997, the "Standard Form of Agreement Between Owner and Contractor"(hereinafter referred to as "the AIA Contract"). Exhibit 1. The contracted price for the project was $124,398.00, which was to be undertaken and substantially completed by September 5, 2000, subject to the adjustments of that timetable as provided for in the contract documents.

In this case, the Standard Contract also referenced a further document, AIA Document A201-1997, the General Conditions of the Contract for Construction"(hereinafter referred to as "the AIA Conditions"). Exhibit 2. Although no copy of AIA Conditions was signed by either party, the express language of the AIA Contract incorporates the AIA Conditions. [2]

## Dispute Between Mr. Marton and Hogan Contracting

In early September 2000, Mr. Marton expressed his concern to Hogan Contracting about the length of time it was taking to complete the project. The dialogue between the parties about the work remaining to be completed, the work changes being requested and the timetable for same, continued over the course of the next two (2) months. Ms. Krsul, as Mr. Marton's architect, serving as the moderator of the parties' respective concerns with one another. Considerable correspondence was exchanged between the parties. Exhibit 3.

Finally, on November 7, 2000, Hogan Contracting wrote to Ms. Krusl, stating that his company would not be resuming work on the Marton project at 200 East 27th Street, based upon Mr. Marton's "increasing uncooperativeness". Exhibit 4.

## Consultation with Attorneys

Thereafter, I was first formally consulted by Mr. Marton about his dispute with Hogan Contracting. [3] On November 8, 2000, Mr. Marton forwarded to me certain documents for

---

[2] The AIA Contract refers to the AIA Conditions in two (2) places: First, in bold type in the margin of the very first page of the AIA Contract and second, in section 8.12, which identifies "Contract Documents".

[3] At or about that time, summer/fall 2000, Mr. Marton maintained a separate office on the same floor in the same building as did Citak & Citak, 18 East 48th Street. Our firm had done legal work for various relatives of Mr. Marton (cousins), on both personal matters (involving matrimonial and estate matters), as well as on litigation matters on behalf of corporate entities in which it is believed Mr. Marton may have had some ownership or beneficial interest (although Mr. Marton was not the person who had retained the services of Citak & Citak on behalf of those corporate entities). As a result of this relationship and the physical proximity of his office to mine, Mr. Marton may have spoken to me prior to November 2000 about his situation with his contractor and the renovation work being done on his apartment. But any such queries were general in nature and the discussions were held merely as an accommodation to him. No action was requested by Mr. Marton on his behalf, nor did he retain our services, as his attorneys.

review, specifically a form AIA Contract and Conditions which Mr. Marton specifically noted were not his actual contract with Hogan Contracting. Exhibit 5. Mr. Marton's immediate concern after Hogan Contracting's refusal to continue with this project was to revoke its access to his apartment. At Mr. Marton's express request and direction, and as an accommodation to him based upon the prior relationship that had existed (see footnote #3), a letter was written on his behalf to Hogan Contracting from our firm over my signature, revoking any authorization that may have previously been granted for access to the Marton apartments. Exhibit 6.

Mr. Marton continued to solicit advice from me. On November 16, 2000, he sent a memo to me, seeking advise on a number of matters relating to his dispute with Hogan Contracting, which was followed by a telephone call to discuss those items. Exhibit 7. We reviewed those issues with him at that time. Finally, given the amount of time that was being expended on Mr. Marton's behalf, on December 6, 2000, I sent a letter to him, setting forth the terms under which we would render legal services to him. The sum of $500.00 was requested "to cover initial conferences, consultations and communications". Exhibit 8.

Mr. Marton did not want to proceed with any litigation at that time. He came into our offices the next day, December 7, 2000, and paid us the sum of $250.00, which he indicated would cover any and all services provided to him to date. Exhibit 9. Mr. Marton further indicated that he would keep us abreast of the work required to complete the renovation work on his apartments and, if and when he decided to take any further action, he would contact us at that time to undertake any such actions on his behalf.

Although Mr. Marton engaged in constant communication with his architect on this construction project over the course of the ensuing months, Exhibit 10, our office received virtually no communication from Mr. Marton regarding this matter for nearly a year and half (throughout 2001 and into 2002). [4] At not time during this period did Mr. Marton request that any legal services be rendered on his behalf by me or our firm in this matter.

April - June 2002

In April 2002, Mr. Marton met with me regarding a different aspect of his dispute with Mr. Hogan. It had been brought to Mr. Marton's attention that a neighbor occupying an

------

[4] In the course of our discussions in November 2000, Mr. Marton asked if I knew of any workman who did top flight tile work. I recommended another client, Arnon Zadok of Ceramica Arnon, Inc., whose services Mr. Marton ultimately engaged. Copies of certain memoranda between Mr. Marton and Ceramica Arnon were sent to us during 2001. The only communications I received from Mr. Marton about his apartment renovation project between December 2000 and the spring of 2002 concerned Mr. Marton's engagement of Ceramica Arnon and then his subsequent dispute with Ceramica Arnon. Exhibit 11.

apartment on the floor below had sustained certain water damage to her apartment, which was claimed to have resulted from allegedly faulty plumbing work in the Marton apartment. Mr. Marton requested that I communicate on his behalf with the attorney representing his neighbor and provide that attorney with various relevant documentation. Once again, at Mr. Marton's express request and direction, and as an accommodation to him, a letter was written on his behalf. Exhibit 12. Although Mr. Marton also discussed what he believed to be the total costs he incurred as a result of the actions/inactions of Hogan Contracting, we also discussed the fact that changes in the nature and scope of the work done at his apartment would reduce or limit any potential sums for which Hogan Contracting might be liable. He did not request any action be taken to commence a proceeding on his behalf at that time.

In June 2002, Mr. Marton again forwarded to us an additional item that he believed should be included in the total additional costs he incurred as a result of the actions/inactions of Hogan Contracting. Although Mr. Marton again did not request any action be taken to commence a proceeding on his behalf at that time, he did express his concern about the statute of limitations in which to commence a breach of contract action. Exhibit 13.

Retention of Services to Commence Action

In late June 2002, Mr. Marton called and stated that he would like to proceed with an action against Hogan Contracting. He insisted that our previous agreement be revised so that the legal fees for our services would not be paid on a fee-for-service hourly basis, but rather be a contingent fee based upon the sums sought to be recovered from Hogan Contracting. Mr. Marton was willing to pay the sum of $750.00 to our firm to cover the initial out-of-pocket costs of actually commencing the action (i.e., index number, process service, etc.). Since Mr. Marton was a member of the extended family of the persons who owned the entity that was the landlord of the building in which we maintained our offices at that time (18 East 48th Street), several of whom we had represented in various personal matters, we were prepared to accommodate him and help him with his claim.

A formal retainer agreement was prepared and sent to Mr. Marton for review. On July 23, 2002, Mr. Marton came to our offices and brought us a signed retainer agreement . On that date, he gave us a check in the sum of $750.00, post-dated for July 29, 2002. Exhibit 14.

Simultaneously, in preparation of our meeting with Mr. Marton, we had drafted a proposed Complaint for Mr. Marton's review. When Mr. Marton came to our offices on July 23rd, we discussed with him not only the strategic decision to proceed with a judicial action, rather than to arbitration, as the forum in which to resolve his dispute with Hogan Contracting, but also each cause of action set forth in the complaint in detail. Exhibit 15.

Although the complaint contained several causes of action, there were many potential shortcomings in the ability to actually succeed on some of the claims asserted. Specifically,

we discussed that it was unlikely that he could prevail on any claim for fraud since New York law did not permit such claims to substitute for breach of contract claims. Similarly, where a tort claim was asserted based upon the same predicate facts as constituted the claim for breach of contract, it was likely that there would not be a separate recovery on that tort claim.

I also discussed with Mr. Marton the fact that he could not expect to collect any damages for any delays in the construction project that were attributable to him. In that regard, we discussed with him that his architect did not make the strongest witness on his behalf since she had written that certain delays were attributed to Mr. Marton. Moreover, Mr. Marton understood that there would be a cost associated with any testimony by his architect and he would be responsible for paying any fees she would chaarge. We also discussed the fact that Hogan Contracting would only be liable for construction work subject to the contract. To the extent that Mr. Marton elected to make changes in completing the job from what had been specifically contracted with Hogan Contracting (either in the nature, scope or materials of the work), any increased costs attributable to such changes could not be assessed against Hogan Contracting. While we agreed that an ad damnum clause seeking $60,000.00 for breach of contract would be plead, there was clearly understood that, based upon his actual proof, the ultimate recovery would fall significantly short of that sum.

Mr. Marton and I also discussed the fact that the named defendant, Hogan Contracting, was a corporation with little or no identifiable assets, and no bond had been posted in connection with this project. That fact raised the possibility that the company could simply cease operations under that name or declare bankruptcy. Such circumstances would eliminate any possibility that Mr. Marton could collect anything at all as a result of the action that was proposed to be commenced.

At the time, we also discussed with Mr. Marton the decision to proceed with a judicial action rather than arbitration, even though that was the forum indicated in the AIA Conditions referred to by his AIA Contract. Mr. Marton reiterated his belief that he did not sign the AIA Conditions and did not believe that the AIA Conditions were part of his contract with Hogan Contracting.

I believe that Mr. Marton understood fully all of the issues that had been discussed, including potential limitations of the monies that could and might be collected, both from a legal and practical perspective. He signed the verification to the Complaint.

Thereafter, a Summons was prepared. Those pleadings were filed in Court and an index number was obtained on August 1, 2002. That same day, copies of the pleadings were sent to a process server used by our firm to effect service on Hogan Contracting. Exhibit 16.

In September 2002, we received written notification from the process server that service at the address that had been provided to us by Mr. Marton for the named defendant

was a residence and that, despite his efforts, service could not be effected upon the corporate defendant at that address. As a result, it would be necessary to effect service upon the defendant through the Secretary of State. Exhibit 17. The pleadings are sent to Albany to effect service upon the Secretary of State. Exhibit 18. In response to Mr. Marton's inquiry about the status of service in October 2002, he was informed that service had in fact been effected on Hogan Contracting through the Secretary of State. Exhibit 19.

Having not heard from the defendant or a legal representative on its behalf, a letter was sent as a predicate to any proposed default. Exhibit 20. This prompted a response from an attorney on defendant's behalf, who requested a copy of the pleadings and an extension of time for 30 days within which to interpose a response. Exhibit 21.

Motion to Dismiss

In early December 2002, we received a Notice of Motion to dismiss the Complaint on various grounds, pursuant to CPLR 3211(a)(1), which motion was returnable December 17, 2002, along with a Memorandum of Law. Exhibit 22 (submitted herein without the exhibits annexed, since those documents are included as other exhibits to this submission). Mr. Marton was advised of this motion. Although Mr. Marton's dispute with Hogan Contracting erupted in November 2000, it had been Mr. Marton's decision not to commence any legal action against Hogan Contracting until June 2002. His initial response was to voice his concern about the timing of the lawsuit. Exhibit 23. On consent of the attorneys for the respective parties, the motion was adjourned to February 2003.

An Affirmation was prepared for Mr. Marton to sign in opposition to this motion. After the contents thereof were reviewed in detail with Mr. Marton, he signed same on February 4, 2003. Exhibit 24 (submitted herein without the exhibits annexed, since most of those documents are included as other exhibits to this submission). As part of the response on Mr. Marton's behalf to the defenses being raised by Defendant, it was decided that a letter would be written to the American Arbitration Association ("AAA"), inquiring as the procedures for having the dispute submitted to arbitration. Exhibit 25

Reply papers from the Defendant's attorneys were received thereafter. Exhibit 26 . The matter was submitted to the Court on February 24, 2003. Thereafter, we were notified that the matter had been assigned to Honorable Judge Joan Madden, who requested oral argument of the motion on March 13, 2003. Mr. Marton was duly informed. Exhibit 27 .

At the conclusion of the oral argument, Defendant's attorney informed us that there would be little point in proceeding against Defendant, which the attorney claimed was in the process of closing or ceasing business operations. Since the matter was still in the early procedural stage and the road to any potential judgment was a long, arduous, time-consuming and expensive one, the likelihood of collecting any monies appeared slim, particularly since

there did not appear to be any available insurance coverage. This was conveyed to Mr. Marton in a telephone call following the oral argument. At which time. Mr. Marton advised us that he would await the Court's decision and see what happened.

Thereafter, there was periodic communications with Mr. Marton, informing him that the motion was still undecided by the Court Exhibit 28.

Our office regularly checked the court records for a decision on this motion. In late June 2003, we received notification that, although the Court had a record of the motion being marked submitted and of the oral argument, it was unable to locate any of the motion papers submitted. The attorneys for each party were advised that to submit a duplicate copy of all papers that had been filed by their respective office in connection with this motion. By letters dated June 27 and June 30, 2003, respectively, those duplicate motion papers were filed with the Court; Mr. Marton was informed that a duplicate set of papers were supplied to the Court, which has misplaced the original papers that had been filed. Exhibit 29.

Although the motion had originally be returnable in December 2002, was submitted in February 2003, was orally argued in March 2003 and duplicate motion papers were supplied by the parties to the Court in June 2003, nothing further transpired on this matter until October 2003, when we received notice of the Court's decision and Order, granting Defendant's motion and dismissing Mr. Marton's action. Exhibit 30.

Request for Arbitration

We thereafter spoke with Mr. Marton about what, if anything, should be the next step to be done. We reminded Mr. Marton that the likelihood of collecting any monies were remote since we were under the impression that Hogan Contracting had ceased doing business. Mr. Marton prevailed upon us to proceed file an arbitration claim on his behalf, which we proceeded to do. Exhibit 31.

On November 19, 2003, we sent Mr. Marton a letter, stating:

"although we had enclosed a check for the filing fee of $ 325.00, we were advised by AAA that this amount was the fee for Mediation only. The fee for a Mediation/Arbitration is $ 750.00. Under your contract, you are required to proceed to Mediation first and then to Arbitration. If you proceed to Mediation under the present $ 325.00 filing fee, the fee for Arbitration at a subsequent date would be the full $ 750.00

Please advise if you simply wish to proceed to Mediation at this time, or to proceed to Mediation/Arbitration, in which case we request that you forward to us a check in the sum of $ 425.00 payable to the American Arbitration Association, which we will tender to them.." Exhibit 32

Thereafter, we received a letter, dated November 21, 2003, from the AAA indicating that another form entitled "Submission to Dispute Resolution" would be required in this case and would require a signature from a representative on behalf of the Defendant. Exhibit 33. That form was thereafter prepared and sent to the Defendant's attorney for signature. Exhibit 34. In the interim, the AAA returned our initialing filing and closed it case file until the proper form and fees were submitted.

Mr Marton was aware of the arbitration status. In late November 2003, I spoke with Mr. Marton and discussed the overall posture of the case and the likely futility of proceeding with this matter further. He scheduled an appointment to come to our offices on Wednesday evening December 3, 2003 to discuss the matter further. He called and cancelled that meeting, indicating that he would come in if he decided to proceed further. It was my understanding that Mr. Marton was not interested in proceeding. Moreover, he never called our office thereafter to re-schedule that appointment.

At no time thereafter, did Mr. Marton ever forward to us the requested disbursements for the filing of the Arbitration proceeding. As a result, we understood that matter to have been abandoned and considered the matter to be closed. That was our understanding when I received the complaint from this committee in mid- January 2006.

Upon receiving the complaint from this committee in January 2006, I reviewed our entire file. In doing so, Mr. Marton's September 2004 letter was found in our file. I do not recall receiving that letter. Since there had been no activity at all relating to this matter since December 2003, the member of our staff who distributes the mail, believing the matter to be closed, appears to have placed that letter directly in the file. It was not brought to my attention for a response, which would have been to confirm that this was a closed matter. I regret that Mr. Marton seems to have misunderstood the status of the matter. At no time did I intend to ignore or slight Mr. Marton in any way. As indicated above, our firm has represented various members of Mr. Marton's extended family (cousins), some of whom are fellow attorneys, who are both colleagues and friends, as well as certain business interests in which those family members as well as Mr. Marton have an interest. (The closeness of our personal and business relationship and frequency of our contact with many of those individuals has diminished over time, since our firm is no longer a tenant in their building).

As a result of not receiving the disbursement monies from Mr. Marton to proceed with an arbitration, of his cancelling an appointment to come to our office, of his failing to call again to re-schedule same, of his indicating that he would communicate with us further, and otherwise then failing to hear from him, we understood that Mr. Marton did not wish to proceed further and presumed this matter to be closed. In the nearly a year and a half since September 2004 (when Mr. Marton sent the letter to our office which was inadvertently placed in our file without a response), no other communication whatsoever in any form (letter, fax, email, telephone call) was received by me or our office from Mr. Marton.

At this time, no proceeding is pending: the judicial action has been dismissed and no arbitration proceeding has been filed. There is no forum within which to make a motion to be relieved as counsel. We obviously do not that it would be fruitful to proceed any further on Mr. Marton's behalf, nor do we wish to do so. He is free to seek any other counsel to do so to pursue any and all claims that he believes he may have. Although the exhibits annexed hereto represent virtually every document in our file, we would produce copies of same to any attorney who contacted us on Mr. Marton's behalf without cost.

We trust that this is a complete response and that this matter can be closed  without further action.

Respectfully submitted,

Donald L. Citak