EXHIBIT "III"



Travelers 1st Choice℠ for Lawyers

# LAWYERS PROFESSIONAL
# LIABILITY POLICY

A Custom Insurance Policy Prepared for:

## Citak & Citak, Esqs
## 270 Madison Avenue, Suite 1203
## New York, NY 10016

LA000 Ed. 6-04  Printed in U.S.A.

© 2004 The St. Paul Travelers Companies, Inc.  All Right Reserved

Travelers 1st Choice℠ for Lawyers

**≡ TRAVELERS**

**LAWYERS PROFESSIONAL LIABILITY**
**DECLARATIONS PAGE**

---

**POLICY NUMBER:** 507JB0670          **ISSUE DATE:** 04/18/2007

<u>THIS IS A CLAIMS-MADE POLICY. PLEASE READ IT CAREFULLY.</u>

**INSURING COMPANY:**     St. Paul Fire and Marine Insurance Company, St. Paul, Minnesota

1.  **NAMED INSURED:**      Citak & Citak, Esqs
                            Attorneys at Law

2.  **PRINCIPAL ADDRESS:**   270 Madison Avenue, Suite 1203
                            New York, NY  10016

3.  **POLICY PERIOD:**       From: 04/28/07          To: 04/28/08
                            **Inception**          **Expiration**
                            (12: 01 A. M. Standard Time at the Principal Address Stated Above)

4.  **LIMITS OF LIABILITY:**   $ 1,000,000  **EACH CLAIM**

                            $ 1,000,000  **POLICY AGGREGATE**

                            "Claims Expenses" are in addition to the Limits of Liability.

5.  **DEDUCTIBLE:**          $ 5,000 **EACH CLAIM**

                            $ N/A  **POLICY AGGREGATE**

                            Deductible Applies to Indemnity only.

6.  **PREMIUM:**             $ 7,173.00

7.  **RETROACTIVE DATE:**    FULL

8.  **FORM AND ENDORSEMENT NUMBERS ATTACHING TO THIS POLICY AT ISSUANCE:**

    SEE ATTACHED FORMS LIST #40705

This policy consists of the Lawyers Professional Liability Declarations, Coverage Form, Endorsements listed above (or attached after inception) and the Application and any applicable supplements or attachments.

LA002 Ed. 12-04  Printed in U.S.A.
© 2004 The St. Paul Travelers Companies, Inc.  All Right Reserved

EXHIBIT "IV"

*Citak & Citak*
*Attorneys at Law*
—

*Burton Citak*
*Donald L. Citak*

*18 East 48th Street, New York, N.Y. 10017*
*(212) 759-9585*
*(800) 794-9585*
*Fax. No. (212) 759-2979*

December 6, 2000

Stuart & Carina Marton
200 East 27th Street, Apt. 14E
New York, New York

Dear Stuart & Carina:

This letter will confirm our understanding that this office will undertake to represent you and provide legal representation and services in connection with your present dispute with Hogan Contracting, Inc. arising out of its breach of contractual obligations regarding the renovation of your cooperative apartments at 200 East 27th Street.

It is agreed that our time will be paid for at the rate of $250.00 per hour, which represents a reduction from our present standard billing rate of $300.00 per hour. This reduction in our billable rate to you is being extended to you as a courtesy with the understanding and expectation that any bills rendered to you in connection with our services will be paid promptly.

As discussed with Stuart, it is requested that you provide with an initial retainer of $500.00 to cover the initial conferences, consultations and communication regarding this issue.

Should you have any questions in connection therewith, please contact the undersigned.

Very truly yours,

Donald L. Citak

DLC/eb

EXHIBIT "V"

STUART E. MARTON
CARINA STERN MARTON
200 EAST 27TH STREET, #14F
NEW YORK, NY 10016-9204

3273

1-1/141
210

DATE 12/7/00

PAY
TO THE
ORDER OF CITAK & CITAK                     | $ 250.00

TWO-HUNDRED FIFTY                          DOLLARS

THE BANK OF NEW YORK
100 EAST 42ND STREET
NEW YORK, N.Y. 10017

FOR retainer

⑆021000018⑆ ⑈1070037633⑈ 3273

# EXHIBIT "VI"

1997 EDITION

# AIA DOCUMENT | A101-1997



## Standard Form of Agreement Between Owner and Contractor
where the basis of payment is a STIPULATED SUM

**AGREEMENT** made as of the
in the year  2000
*(In words, indicate day, month and year)*

19ᵗʰ    day of  MAY

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

**BETWEEN** the Owner:
*(Name, address and other information)*

STUART MARTON
CARINA STERN MARTON
200 EAST 27 ST, #14F
NY, NY    10016

AIA Document A201-1997, General Conditions of the Contract for Construction, is adopted in this document by reference. Do not use with other general conditions unless this document is modified.

and the Contractor:
*(Name, address and other information)*

HOGAN CONTRACTING, INC.
247 WEST HARTSDALE AVE
HARTSDALE, NY 10530

This document has been approved and endorsed by The Associated General Contractors of America.

The Project is:
*(Name and location)*

COMBINATION AND RENOVATION
OF APARTMENTS #14E & #14F,
200 EAST 27 STREET,
NY   NY    10016

The Architect is:
*(Name, address and other information)*

ANN KRSUL, R.A.
ANN KRSUL ARCHITECTURE
160 FIFTH AVENUE, SUITE 800
NY, NY    10010
(212) 255-0291

©1997  AIA®
**AIA DOCUMENT A101-1997**
OWNER-CONTRACTOR
AGREEMENT

The Owner and Contractor agree as follows.

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

Copyright 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution.

## ARTICLE 1 THE CONTRACT DOCUMENTS

The Contract Documents consist of this Agreement, Conditions of the Contract (General, Supplementary and other Conditions), Drawings, Specifications, Addenda issued prior to execution of this Agreement, other documents listed in this Agreement and Modifications issued after execution of this Agreement; these form the Contract, and are as fully a part of the Contract as if attached to this Agreement or repeated herein. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. An enumeration of the Contract Documents, other than Modifications, appears in Article 8.

## ARTICLE 2 THE WORK OF THIS CONTRACT

The Contractor shall fully execute the Work described in the Contract Documents, except to the extent specifically indicated in the Contract Documents to be the responsibility of others.

## ARTICLE 3 DATE OF COMMENCEMENT AND SUBSTANTIAL COMPLETION

3.1   The date of commencement of the Work shall be the date of this Agreement unless a different date is stated below or provision is made for the date to be fixed in a notice to proceed issued by the Owner.
*(Insert the date of commencement if it differs from the date of this Agreement or, if applicable, state that the date will be fixed in a notice to proceed.)*

JUNE 8, 2000

If, prior to the commencement of the Work, the Owner requires time to file mortgages, mechanic's liens and other security interests, the Owner's time requirement shall be as follows:

3.2   The Contract Time shall be measured from the date of commencement.

3.3   The Contractor shall achieve Substantial Completion of the entire Work not later than days from the date of commencement, or as follows:
*(Insert number of calendar days. Alternatively, a calendar date may be used when coordinated with the date of commencement. Unless stated elsewhere in the Contract Documents, insert any requirements for earlier Substantial Completion of certain portions of the Work.)*

SEPTEMBER 5, 2000

, subject to adjustments of this Contract Time as provided in the Contract Documents.
*(Insert provisions, if any, for liquidated damages relating to failure to complete on time or for bonus payments for early completion of the Work.)*

THE CONTRACTOR AND THE CONTRACTOR'S SURETY, IF ANY, SHALL BE LIABLE FOR AND SHALL PAY THE OWNER THE SUMS HEREINAFTER STIPULATED AS LIQUIDATED DAMAGES FOR EACH CALENDAR DAY OF DELAY UNTIL THE WORK IS SUBSTANTIALLY COMPLETE: ONE-HUNDRED SEVENTY-FIVE DOLLARS (#175).



© 1997  A I A ®
AIA DOCUMENT A101-1997
OWNER-CONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292



## ARTICLE 4  CONTRACT SUM

**4.1**   The Owner shall pay the Contractor the Contract Sum in current funds for the Contractor's performance of the Contract. The Contract Sum shall be ~~ONE-HUNDRED TWENTY-FOUR THOUSAND THREE-HUNDRED NINETY-EIGHT~~ Dollars ($124,398 ), AND AS OUTLINED) subject to additions and deductions as provided in the Contract Documents.

**4.2**   The Contract Sum is based upon the following alternates, if any, which are described in the Contract Documents and are hereby accepted by the Owner:

*(State the numbers or other identification of accepted alternates. If decisions on other alternates are to be made by the Owner subsequent to the execution of this Agreement, attach a schedule of such other alternates showing the amount for each and the date when that amount expires.)*

IN THE CONTRACTOR'S ATTACHED "FINAL ESTIMATE", THIS CONTRACT SUM INCLUDES ALL "OPTIONAL ITEMS", SOME OR ALL OF WHICH MAY BE EXCLUDED AT THE SOLE OPTION OF THE OWNER.

~~**4.3**   Unit prices, if any, are as follows:~~

## ARTICLE 5  PAYMENTS

### 5.1   PROGRESS PAYMENTS

**5.1.1** Based upon Applications for Payment submitted to the Architect by the Contractor and Certificates for Payment issued by the Architect, the Owner shall make progress payments on account of the Contract Sum to the Contractor as provided below and elsewhere in the Contract Documents. A PROGRESS PAYMENT SCHEDULE IS ATTACHED.

~~**5.1.2** The period covered by each Application for Payment shall be one calendar month ending on the last day of the month, or as follows:~~

5.13   OWNER SHALL MAKE PAYMENT TO CONTRACTOR NOT LATER THAN SEVEN (7) DAYS AFTER THE ARCHITECT HAS APPROVED AN APPLICATION FOR PAYMENT.

~~**5.1.3** Provided that an Application for Payment is received by the Architect not later than the~~ day of a month, the Owner shall make payment to the Contractor not ~~later than the~~                    day of the                              month. If an Application for Payment is ~~received by the Architect~~ after the application date fixed above, payment shall be made by the Owner not later than                              days after the Architect ~~receives the Application for Payment.~~

**5.1.4** Each Application for Payment shall be based on the most recent schedule of values submitted by the Contractor in accordance with the Contract Documents. The schedule of values shall allocate the entire Contract Sum among the various portions of the Work. The schedule of values shall be prepared in such form and supported by such data to substantiate its accuracy as the Architect may require. This schedule, unless objected to by the Architect, shall be used as a basis for reviewing the Contractor's Applications for Payment.



© 1997  A I A®
AIA DOCUMENT A101-1997
OWNER-CONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292



5.1.5  Applications for Payment shall indicate the percentage of completion of each portion of the Work as of the end of the period covered by the Application for Payment.

5.1.6  Subject to other provisions of the Contract Documents, the amount of each progress payment shall be computed as follows:

.1  Take that portion of the Contract Sum properly allocable to completed Work as determined by multiplying the percentage completion of each portion of the Work by the share of the Contract Sum allocated to that portion of the Work in the schedule of values, less retainage of _____ percent ( %). Pending final determination of cost to the Owner of changes in the Work, amounts not in dispute shall be included as provided in Subparagraph 7.3.8 of AIA Document A201-1997;

.2  Add that portion of the Contract Sum properly allocable to materials and equipment delivered and suitably stored at the site for subsequent incorporation in the completed construction (or, if approved in advance by the Owner, suitably stored off the site at a location agreed upon in writing), less retainage of _____ percent ( %);

.3  Subtract the aggregate of previous payments made by the Owner; and

.4  Subtract amounts, if any, for which the Architect has withheld or nullified a Certificate for Payment as provided in Paragraph 9.5 of AIA Document A201-1997.

5.1.7  The progress payment amount determined in accordance with Subparagraph 5.1.6 shall be further modified under the following circumstances:

.1  Add, upon Substantial Completion of the Work, a sum sufficient to increase the total payments to the full amount of the Contract Sum, less such amounts as the Architect shall determine for incomplete Work, retainage applicable to such work and unsettled claims; and (Subparagraph 9.8.5 of AIA Document A201-1997 requires release of applicable retainage upon Substantial Completion of Work with consent of surety, if any.)

.2  Add, if final completion of the Work is thereafter materially delayed through no fault of the Contractor, any additional amounts payable in accordance with Subparagraph 9.10.3 of AIA Document A201-1997.

5.1.8  Reduction or limitation of retainage, if any, shall be as follows:

*(If it is intended, prior to Substantial Completion of the entire Work, to reduce or limit the retainage resulting from the percentages inserted in Clauses 5.1.6.1 and 5.1.6.2 above, and this is not explained elsewhere in the Contract Documents, insert here provisions for such reduction or limitation.)*

5.1.9  Except with the Owner's prior approval, the Contractor shall not make advance payments to suppliers for materials or equipment which have not been delivered and stored at the site.

## 5.2   FINAL PAYMENT

5.2.1  Final payment, constituting the entire unpaid balance of the Contract Sum, shall be made by the Owner to the Contractor when:

.1  the Contractor has fully performed the Contract except for the Contractor's responsibility to correct Work as provided in Subparagraph 12.2.2 of AIA Document A201-1997, and to satisfy other requirements, if any, which extend beyond final payment; and

.2  a final Certificate for Payment has been issued by the Architect.



© 1997   A I A ®
AIA DOCUMENT A101-1997
OWNER-CONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

WARNING: Unlicensed photocopying violates U.S. copyright laws ...



**5.2.2** The Owner's final payment to the Contractor shall be made no later than 30 days after the issuance of the Architect's final Certificate for Payment, or as follows:

## ARTICLE 6 TERMINATION OR SUSPENSION

**6.1** The Contract may be terminated by the Owner or the Contractor as provided in Article 14 of AIA Document A201-1997.

**6.2** The Work may be suspended by the Owner as provided in Article 14 of AIA Document A201-1997.

## ARTICLE 7 MISCELLANEOUS PROVISIONS

**7.1** Where reference is made in this Agreement to a provision of AIA Document A201-1997 or another Contract Document, the reference refers to that provision as amended or supplemented by other provisions of the Contract Documents.

**7.2** Payments due and unpaid under the Contract shall bear interest from the date payment is due at the rate stated below, or in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located.
*(Insert rate of interest agreed upon, if any.)*

*(Usury laws and requirements under the Federal Truth in Lending Act, similar state and local consumer credit laws and other regulations at the Owner's and Contractor's principal places of business, the location of the Project and elsewhere may affect the validity of this provision. Legal advice should be obtained with respect to deletions or modifications, and also regarding requirements such as written disclosures or waivers.)*

**7.3** The Owner's representative is:
*(Name, address and other information)*

STUART MARTON
(917) 748-5523

**7.4** The Contractor's representative is:
*(Name, address and other information)*

RAY HOGAN
(914) 715-3437
(414) 684-0277

**7.5** Neither the Owner's nor the Contractor's representative shall be changed without ten days' written notice to the other party.

**7.6** Other provisions:

(1) CONTRACTOR WILL COMPLY WITH ALL BUILDING RULES REGARDING CONSTRUCTION INCLUDING INSURANCE PROVISIONS.

(2) CONTRACTOR WILL OBTAIN WAIVERS OF MECHANICS' LIENS FROM ALL SUBCONTRACTORS (AND HIMSELF UPON FINAL PAYMENT) PRIOR TO FINAL PAYMENT, AND GIVE TO OWNER.

(3) CONTRACTOR IS RESPONSIBLE FOR ALL DAMAGE TO PUBLIC AREAS OF BUILDING CAUSED BY HIS WORKERS/CONTRACTORS.

( CONTINUED ON NEXT PAGE )

© 1997 AIA®
**AIA DOCUMENT A101-1997**
OWNER-CONTRACTOR AGREEMENT

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject ...

SECTION 7.6, CONTINUED                        P. 5A

(4)  CONTRACTOR MUST PROVIDE OWNER WITH
     PROOF OF WORKMANS' COMPENSATION
     INSURANCE COVERAGE.

(5)  CONTRACTOR MUST CARRY LIABILITY
     INSURANCE COVERAGE IN AN AMOUNT
     NOT LESS THAN $1 MILLION, AND
     NAME OWNER AS AN ADDITIONAL INSURED,
     AND PROVIDE OWNER WITH A
     CERTIFICATE OF INSURANCE.

## ARTICLE 8 ENUMERATION OF CONTRACT DOCUMENTS

8.1   The Contract Documents, except for Modifications issued after execution of this Agreement, are enumerated as follows: ARCHITECT'S PLANS DATED 2/8/00, CONTRACTOR'S "FINAL ESTIMATE" DATED 4/26/00, AND PROGRESS PAYMENT SCHEDULE.

8.1.1   The Agreement is this executed 1997 edition of the Standard Form of Agreement Between Owner and Contractor, AIA Document A101-1997.

8.1.2   The General Conditions are the 1997 edition of the General Conditions of the Contract for Construction, AIA Document A201-1997.

8.1.3   The Supplementary and other Conditions of the Contract are those contained in the Project Manual dated _____, and are as follows:

Document          Title          Pages

8.1.4   The Specifications are those contained in the Project Manual dated as in Subparagraph 8.1.3, and are as follows:
(Either list the Specifications here or refer to an exhibit attached to this Agreement.)

Section          Title          Pages

8.1.5   The Drawings are as follows, and are dated   FEBRUARY 8, 2000   unless a different date is shown below:
(Either list the Drawings here or refer to an exhibit attached to this Agreement.)

Number          Title          Date

PLANS DRAWN BY ANN KNSUL ARCHITECTURE, AND TECHNICAL DISCUSSIONS BETWEEN ARCHITECT AND CONTRACTOR.



© 1997  A I A ®
AIA DOCUMENT A101-1997
OWNER-CONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292



8.1.6 The Addenda, if any, are as follows:

Number                    Date                              Pages

Portions of Addenda relating to bidding requirements are not part of the Contract Documents unless the bidding requirements are also enumerated in this Article 8.

**8.1.7** - Other documents, if any, forming part of the Contract Documents are as follows:

*(List here any additional documents that are intended to form part of the Contract Documents. AIA Document A201-1997 provides that bidding requirements such as advertisement or invitation to bid, Instructions to Bidders, sample forms and the Contractor's bid are not part of the Contract Documents unless enumerated in this Agreement. They should be listed here only if intended to be part of the Contract Documents.)*

This Agreement is entered into as of the day and year first written above and is executed in at least three original copies, of which one is to be delivered to the Contractor, one to the Architect for use in the administration of the Contract, and the remainder to the Owner.

HOGAN CONTRACTING, INC.

**OWNER** *(Signature)*                          **CONTRACTOR** *(Signature)*

STUART MARTIN                                RAY HOGAN, PRESIDENT
CARINA STERN MARTIN

*(Printed name and title)*                      *(Printed name and title)*

**CAUTION:** *You should sign an original AIA document or a licensed reproduction. Originals contain the AIA logo printed in red; licensed reproductions are those produced in accordance with the Instructions to this document.*



© 1997   AIA®
**AIA DOCUMENT A101-1997**
OWNER-CONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292



# EXHIBIT "VII"

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------------x
STUART MARTON and CARINA STERN MARTON

                              Plaintiffs,

        - against -                                      Index #: 602826/2002

HOGAN CONTRACTING, INC.
                              Defendant.          AFFIDAVIT IN OPPOSITION

-----------------------------------------------------------------------

STATE OF NEW YORK        )
                         )ss.:
COUNTY OF NEW YORK       )

STUART MARTON, being duly sworn deposes and says:

1.    I am one of the Plaintiffs in this matter and, as such, am fully familiar with the
      facts and circumstances herein. This Affidavit is submitted in opposition to
      Defendant's motion, which seeks to dismiss our Complaint on various
      grounds.

2.    For purposes of the present motion to dismiss, our attorneys inform us that the
      facts in our Complaint are to be "deemed" true. Nevertheless, certain facts are
      readily admitted by Defendant:

      a.    My wife and I are the Plaintiffs herein.

      b.    We were and still are the owners of Apartments #14E and #14F at the
            premises located at 200 East 27th Street, New York, NY 10016
            (hereinafter "the subject apartments").

c.    In May 2000, we entered into a contract with Defendant pursuant to which Defendant was to undertake construction involving the combination and renovation of the subject apartments, making them into one residential unit. Defendant was to provide all work, labor and services and furnish all goods, materials and equipment necessary to complete the entire project for the subject apartments (except for certain items specifically identified in our contract which we were to supply). Defendant was also contractually responsible to secure all necessary governmental permits for the work to be done (even though in fact we paid for all permit fees, which Defendant was contractually obligated to pay and were never credited to us). Ultimately, Defendant would have also been responsible to obtain approvals for the work upon its completion.

d.    Upon completion of the project, we expected to have a single residential unit in which to reside with our two (2) young children, then ages four (4) and two(2).

e.    The written contract took the form of AIA Document A101-1997, which is entitled "Standard Form of Agreement Between Owner and Contractor, where the basis of payment is a STIPULATED SUM", a copy of which is annexed as Exhibit "2" to Defendant's moving papers. It should be noted that the document annexed by Defendant is

incomplete since it does <u>not</u> contain the "Final Estimate" referred to

therein and attached thereto, which itemizes in detail the actual work

to be done, the cost assigned to each task and certain potential options

that were available for us to choose from and the cost thereof. This

Final Estimate was prepared by Defendant. See <u>Exhibit "A"</u>.

f.    Although the handwriting on the contract document is mine, that

document was written after express agreement was reached with Ray

Hogan, the principal of Defendant HOGAN CONTRACTING, INC.

g.    The stated Contract Sum of this project (as set forth in Article 4 of the

AIA Document - Exhibit 2 of the moving papers) was $124,398.00.

h...    The project was scheduled to commence on June 8, 2000.

i.    Defendant was to "achieve Substantial Completion of the entire work"

on or before September 5, 2002.

j.    The start date and substantial completion date were critical dates since

we were required to vacate our home during construction and were

able to make arrangements do so during the summer (June, July and

August).

3.    Defendant makes a great ballyhoo about the "General Conditions"; in reality,

they should not even be considered part of our agreement. Neither Defendant

or ourselves ever signed or initialed any copy of those General Conditions.

At no time during our contract discussions with Defendant or the construction

process itself, was a copy of these General Conditions ever provided to me by the Defendant, the Architect or anyone else. In fact, we never even saw a copy of those General Conditions until months after Defendant walked off this job. Therefore, even though they are "referred" to in the pre-printed form contract (AIA Document A101-1997), the inclusion of those General Conditions is in error. Nevertheless, as indicated below, there has been no violation of those General Conditions that would in any way bar our claims against Defendant.

4.      As illustrated below, Mr. Hogan's recollection of the events are patently inaccurate and are contradicted by the documentary evidence (which he has deliberately elected not to show to this Court in the moving papers, despite that fact that he clearly has of copies of these documents in his possession).

Dispute Between Parties Was Submitted to Architect

5.      From the outset, the dates for the project's commencement and its completion were very important to us. As initially planned, this project was to have us vacate the apartment for a period of three (3) months - June, July and August. Our two (2) small children had been enrolled in nursery school, the term for which ended shortly before the scheduled start date of June 8, 2000. We had made arrangements for our entire family to move into the home of my parents in Tenafly, New Jersey, for those three (3) summer months. Both my wife and I were going to commute approximately two (2) to three (3) hours round trip

each day from Tenafly into our respective offices in midtown Manhattan during these three (3) months.

6.   Our expressly stated intention (and Defendant's contractual obligation) was to have this project completed by the end of the summer so that our family could return to a newly renovated home, <u>before</u> the children were scheduled to start their new term in nursery school. For this reason, our contract with Defendant contained the following express language:

> The Contractor and the Contractor's Surety, if any, shall be liable for and shall pay the Owner the sums hereinafter stipulated as liquidated damages for each calendar day of delay until the work is substantially complete: One Hundred Seventy-Five Dollars ($175)

As it turned out, our family was unable to return to our home until April 2001, some eight (8) months linger than was initially planned and projected when we commenced this project.

7.   During August 2000, Defendant essentially stopped working on this project, dooming the ability to complete the project in the contractually stated time frame. As a result, the project was <u>not</u> even near completion by September 5, 2002, as had been promised by Defendant. While I am informed that every construction project experiences delays because many forces are at work, during August 2000, Defendant often had no one at all doing any work on any aspect of the project at the subject apartments and. As a result, caused the project to come to a virtual halt.

8.      The Architect on this project from its inception and at all times relevant herein was Ann Krsul. She had been on site regularly before, during and after the construction phase of this project. Throughout the construction, she had been in regular and constant contact with Defendant as well as ourselves. During August, there were innumerable conversations between myself, Ray Hogan and Ann Krsul regarding the pace of the work on this project, as well as the manner in which the work was being done.

9.      As it happened, Ms. Krsul was away on vacation from August 28 through September 5, 2000. Immediately upon her return, I raised serious complaints with her concerning the project, completion of which was now late. On September 6, 2000, Ms. Krsul did precisely what Mr. Hogan erroneously (and falsely) asserts was not done - she commenced to mediate the dispute that had arisen between the parties and which was submitted to her. Evidence of her efforts are well documented. On that same day (September 6, 2000), she wrote to Defendant detailing the problems and issues of the dispute that had arisen between Defendant and ourselves. See Exhibit "B". Among other things, Ms. Krsul specifically advises Defendant in writing that she had *inter alia*:

i)      visited the site;

ii)     was disappointed in the progress;

iii)    observed a serious lack of activity;

iv)     confirmed that Defendant admitted to her that this project was no longer a priority; and

v)    believed that Defendant was purposely dragging his feet.

Ms. Krsul concluded her letter by requesting that Defendant finish the job in a timely and workmanlike manner.

10.    Thereafter, Ms. Krsul kept me apprized by email of her conversations with Mr. Hogan, since I was out-of-town for a few days. Exhibit "C". Upon my return, during late September and into October 2000, a series of meetings and conversations were held between Ms. Krsul, Mr. Hogan, myself and often my wife as well, in effort to mediate our dispute, with the primary goal being the completion of the work on this project as expeditiously as possible. Exhibit "D". Although the work on this project was being done at a snail's pace during this time, my wife and I were still hopeful that Defendant could complete with work in a matter of weeks so that we could return home. Since the project was not completed, we were not able to move back into our apartment that fall. As a result, this placed significant hardships on our family commencing in September and ultimately continuing until April 2001, including driving two (2) small children two (2) to three (3) hours round trip each day, so that they could attend the nursery school classes in which they had been enrolled, as well as necessitating that each of us commute into Manhattan for our jobs.

11.    As the project's Architect, Ms. Krsul expended considerable efforts to mediate the disputes between ourselves and Defendant. Following a critical meeting

that took place on October 23, 2000, both Defendant and myself, independently of one another, each wrote to Ms. Krsul and to one another, detailing our versions of the claims in dispute that existed between us regarding this project. Exhibit "E" (Plaintiff's communication) and Exhibit "F" (Defendant's communication). Defendant was now demanding, as a conndition of continuing to work on the project at all, that we "waive all late finish penalty charges". I followed those communications with additional written responses to Mr. Hogan's communications in which certain change orders regarding this project were sent to me. I indicated a willingness to waive such late charges, if the project would be completed with certainty and without any further delays. See Exhibit "G".

12.  On October 25, 2000, Mr. Hogan orally informed Ms. Krsul that he had stopped working on our project completely (even though he had already stopped not worked on our project during August and September) and was refusing to continue. Thereafter, over the next few days, Ms. Krsul continued to attempt to work out a formal resolution of this dispute. She drafted a formal document regarding the "Marton Project", which she sent to me on October 26, 2000 for consideration and comment; I returned a marked-up version to Ms.Krsul that same day. See Exhibit "H". Based upon the comments she received, Ms. Krsul revised her proposed Agreement and sent it to Defendant and myself on October 27, 2000, and then again on October 30, 2000 with

additional revisions.    See Exhibit "I". Defendant submitted additional comments to this proposed Agreement on October 31, 2000. See Exhibit "J". Based upon Defendant's comments, Ms. Krsul revised her Agreement yet again on October 31, 2000. See Exhibit "K". Additional communications were faxed between the parties on November 2, 2000. See Exhibit "L". Ms. Krsul thereafter again revised her Agreement yet again on November 6, 2000. See Exhibit "M".

13.    Unfortunately, all of Ms Krsul's efforts to mediate the dispute between Defendant and myself were naught. On the very next day, November 7, 2000, Defendant wrote to Ms. Krsul and stated as follows:

"In response to your most recent fax, please be advised that because of the increasing uncooperativeness of Mr. Marton, we will not be resuming work at 200 East 27th Street, Apts 14E and 14F New York, NY.

Please be advised that it is our intention to notify the New York City Building Department of our decision to withdraw from the project and of the stage we were at at the time of ceasing work. We must also advised them of the inconsistency of the present layout in comparison to the drawings that were filed with the NYC Building Department.

All subcontractors have been notified of our decision.

We will also be notifying the Building Management at 200 East 27th Street as to the work stoppage and the reasons for same.

Our final invoice will be forwarded to Mr. Marton and prompt payment is advised. You will be receiving a copy of same."

See Exhibit "N".

14.    As a result, there can be no doubt whatsoever that Defendant walked away from this job and washed his hands of any and all responsibilities for the particular project in question. Defendant's actions were clear, unequivocal, deliberate, intentional and final. All of Ms. Krsul's efforts to mediate the dispute between Defendant and ourselves had failed completely.

15.    On November 8, 2000, Mr. Krsul and myself walked through each room of the subject apartments to note the work that had been left undone and incomplete by Defendant. Ms. Krsul confirmed in writing that significant items were incomplete and/or missing. See Exhibit "O".

16.    As is plainly evident from the myriad of written communications between Defendant, myself and Ms. Krsul, see Exhibits "B" though "M" above, our "claims" against Defendant had clearly already been "initiated".   Under the terms of the parties' Agreement, all that is required to "initiate" a claim is that notice must be given to the Architect. See General Condition 4.3.1 ("Claims must be initiated by written notice to the Architect and the other party.") There can be absolutely no doubt whatsoever that, in the case at bar, the Architect on this project, Ms. Krsul, had clear unequivocal written notice of the "claims" (i.e. the disputes) between the parties herein. Thus our

"claims" against Defendant were initiated, as defined by the parties' contract.

17.  Defendant is correct in stating that the terms of the parties' Agreement mandate that "claims" must be brought before the Architect within 21 days" after either i) the occurrence of the event first giving rise to the claim or ii) the recognition of the condition giving rise to the claim - whichever is later. By virtue of the myriad of correspondence between the parties, as evidenced by Exhibits "B" through "M", there can be no doubt that our "claims" (i.e. our issues in dispute with Defendant) were timely initiated throughout the two (2) month period leading up to November 7, 2000, when Defendant walked off the job, never to return, dooming Ms. Krsul's mediation efforts to failure, and causing considerable delay in our ability to have the construction of our home completed.

18.  Once a claim has been "initiated" between the parties by notice to the Architect, which was clearly done in this case, there is no time limit specified in the parties' Agreement as to when any particular claim must be submitted to either mediation, arbitration or litigation.

19.  Where no time limit is specified in an Agreement when mediation, arbitration or litigation should be commenced - as is precisely the situation in the present case - our attorneys inform me that, the

statutory period of limitations applies. In this case, our "claims" arose between September and November 2000. This suit was commenced in August 2002. There is no statute of limitations issue for any cause of action set forth in our Complaint for our "claims" against Defendant.

20.   That being the case, since Defendant has sought to enforce its right to mediation and/or arbitration, we are prepared to submit our claims herein to mediation and/or arbitration immediately. Simultaneously with the filing of these responding papers, we have sent a formal demand for mediation, as Defendant claims is required by the parties' Agreement. See Exhibit "P".

21.   In reality, we have acted diligently to try to clean up the mess that was created by Defendant's actions in walking off this project without completing the job. Defendant's actions prevented our family from moving back into our home after the summer. Considerable aggravation and unnecessary angst were caused by Defendant's actions, including driving two small children two (2) to three (3) hours round trip each day to attend their respective nursery school classes. Likewise, my wife and I were both required to commute round trip between Tenafly, NJ and our respective midtown Manhattan offices.

22.   It was difficult for us to get a new contractor to come in and complete

this project after Defendant abandoned the project. Most contractors with whom I spoke were very reluctant and even unwilling to undertake the work needed to complete this project. It took a month before I was able to secure a new contractor to begin to complete the work. Additional paperwork was required to be submitted to the New York City Building Department for new work permits. Additional difficulties were encountered when it was discovered that the electrician that Defendant herein had used , Phil Budinger, was not a licensed electrician and neither he (nor Defendant) had filed for the requisite electrical permits regarding this project.

23. Similar difficulties were encountered regarding completion of the required plumbing work. The new plumber that was hired, Time Mechanicals, Inc., required specific indemnification language before undertaking any work on our project. See Exhibit "Q".

24. Rather than September 2000, our family was finally able to move back into our home in April 2001. But it was even later, between October 2001 and February 2002, that we receive the actual electrical, plumbing and completion sign-offs from the New York City Building Department for our project.

25. Only after the completion of the entire project has it become clear why Defendant walked off the job. It was a matter of simple economics.

The Contract Sum for this job was $124,398.00. By the time Defendant had started his work stoppage in August/September 2000, we had already paid him the sum of $99,516.00 against that Contract Sum (and an additional $9,088.00 for authorized change orders). See Exhibit "R". This left $24,882.00 left to be paid to Defendant under the Contract Sum to finish the job. After Defendant walked off the job and stopped work, we expended in excess of $68,000.00 to finish the items that had been contracted for with Defendant (or to redo and/or work that Defendant had done improperly and/or which required repair). It simply did not pay for Defendant to complete our project because Defendant had already received the bulk of its money from the job. Because Defendant had underbid the job, Defendant would have lost a considerable sum of money, if it had tried to complete the work that it was contractually obligated to do for the stated Contract Sum .

26.    As a result, it is clear that Defendant's argument that had Plaintiffs' "claim" been submitted to mediation and/or arbitration earlier, Defendant "would have abided by the resolution and continued to completion" is pure fiction and fallacy on Defendant's part. One need only look at the totality of defendant's actions - i) walking off this job, ii) refusing to complete the project, iii) announcing its intention to

notify the NYC Building Department not only of its withdrawal from the project but also of alleged inconsistency between construction that it had done and filed drawings, iv) notifying all subcontractors and v) notifying Building Management at 200 East 27th Street, and consider the overall economics involved in this project - to conclude that Defendant was not coming back to work on this project. Such actions by Defendant obliterated any and all trust that may have existed between the parties.

27.    Defendant's claims that parties' "recollection" may have been fresher at an earlier point in time is not germane nor dispositive of the issues herein. Given the detailed documentation exchanged between the parties (some of which is annexed as Exhibits hereto), it will not be difficult for the parties to know what was happening, what was not happening, what was said, what was not said, what was done and what was not done between the parties regarding this project. Moreover, that is precisely what is done at a fact-finding hearing, whether mediation, arbitration or litigation. The fact is that our claims have been validly initiated, as demonstrated herein, and are not time-barred.

28.    This action was then commenced in August 2002, well within any Statute of Limitations that Defendant would claim could possibly apply (whether tort or contract). Therefore, since it is clear that there is no contractual or statutory prohibition to proceeding with our claims at this time, Defendant's motion should be dismissed in its entirety. The only possible issue could be the forum in which those disputes are to be resolved and, given our statements herein, that also should not be an issue in dispute.


_____
STUART MARTON

Sworn to before me
February 4, 2003


DONALD L. CITAK
Notary Public, State of New York
No. 02CI4766413
Qualified in Nassau County
Commission Expires April 30, 200_