UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
CITAK & CITAK, DONALD CITAK and
BURTON CITAK,

                              Plaintiffs,          **Civil Action No. 07 CIV 5459 (WHP)**

    -       against       -

THE ST. PAUL TRAVELERS COMPANIES,
INC., a/k/a ST. PAUL FIRE AND MARINE
INSURANCE COMPANY,

                              Defendant.
-------------------------------------------------------X

### DECLARATION

### IN SUPPORT OF PLAINTIFFS' CROSS-MOTION TO AMEND COMPLAINT AND IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

DONALD L. CITAK, an attorney duly licensed to practice law before the courts in the State

of New York and admitted to the Bar of the District Court for the Southern District of New

York, subscribes and declares under penalty of perjury that the following is true and correct,

pursuant to 28 U.S.C. § 1746.

1. I am one of the Plaintiffs in the above-captioned action. As such, I am fully familiar with the

facts and circumstances of this case. I submit this Declaration in support of Plaintiffs motion

to amend the Amended Complaint herein pursuant to Rule (15(a)(2) of the Federal Rules of

Civil Procedure and in opposition to Defendant's motion to dismiss Plaintiffs' complaint

pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

1

**Plaintiffs Should Be Permitted to Re-Amend the Amended Complaint**

2. Plaintiff's Amended Complaint is annexed as Exhibit "I". Ten (10) exhibits are annexed and made part of that pleading (hereinafter the "Amended Complaint"). In the interest of justice and fairness, this Court should permit Plaintiffs to re-amend this Complaint to correct a factual error noted therein.

3. Paragraph 10 of the Amended Complaint states as follows:

"On or about December 2005, Plaintiffs received a letter from the Departmental Disciplinary Committee of the First Judicial Department of the Supreme Court of the State of New York (hereinafter referred to as the "DDC") enclosing a document that the DDC had received from STUART and CARINA MARTON (hereinafter referred to as the "MARTONS"), who were former clients of Plaintiffs, and requested a response from Plaintiffs. A copy of the MARTONS' document is annexed hereto and incorporated herein as Exhibit "2" (hereinafter referred to as the "MARTONS' DDC Statement").

See Exhibit "I" - Amended Complaint. The Martons' DDC Statement is dated December 21, 2005 and stamped received by the DDC on December 23, 2005. See Exhibit "I" - Amended Complaint (and Exhibit 2 annexed thereto). Since the DDC first received the Martons' DDC Statement on December 23, 2005, clearly Plaintiffs did not receive that document in December 2005.

4. When Plaintiffs filed the application for insurance coverage from Defendant, which application was signed and mailed on January 20, 2006, Plaintiffs did not have knowledge of the Martons' DDC Statement. Defendant's assertion to the contrary is simply unfounded and wrong. Nevertheless, we did not have within our files any document proving when we

2

actually received the Martons' DDC Statement. We requested that the DDC examine its files to see if any document existed establishing our receipt thereof (i.e., U.S. Postal Service PS Form 3811 - green Domestic Return Receipt card). We were informed that the DDC sends out such documents by regular mail. But in its files, the DDC had a letter, dated January 27, 2006 from myself to Joel A. Peterson regarding the Martons' DDC Statement (hereinafter the "Peterson Letter"). See Exhibit "II" – Proposed Second Amended Complaint (specifically Exhibit 2A annexed thereto)(Note: Exhibit 2A is the only new exhibit proposed to be included in this new pleading; all other documents annexed to the Amended Complaint are similarly annexed and numbered to the Second Amended Complaint).

5. Reviewing the Peterson Letter has refreshed my recollection that, at the time that Plaintiffs actually received notice of the Martons' DDC Statement, I had called Mr. Peterson to request an extension of time with which to reply to the Martons' DDC Statement because the initial allotted time had nearly expired. The Peterson Letter was faxed and mailed as confirmation of my telephone conversation with him in which he granted the extension of time to respond to the Martons' DDC Statement. That telephone conversation was held on the day that Plaintiffs actually received notice of the Martons' DDC Statement, which based upon the Peterson Letter, is believed to be on or about January 27, 2006, not "on or about December 2005" as previously and imprecisely stated in paragraph 10 of the Amended Complaint.

6. In light of the Peterson Letter and its significant ramifications, it is respectfully requested that the Court permit Plaintiffs to re-amend the Amended Complaint herein to reflect accurately

3

the date on which Plaintiffs actually received notice of the Martons' DDC Complaint. The

new language proposed to be included in Plaintiffs' new pleading is set forth in paragraph 10

of the Proposed Second Amended Complaint (Exhibit II to this motion) as follows:

> "Upon information and belief, on or about January 27, 2006, Plaintiffs received a letter
> from the Departmental Disciplinary Committee of the First Judicial Department of the
> Supreme Court of the State of New York (hereinafter referred to as the "DDC") enclosing
> a document that the DDC had received from STUART and CARINA MARTON
> (hereinafter referred to as the "MARTONS"), who were former clients of Plaintiffs, and
> requested a response from Plaintiffs. A copy of the MARTONS' document is annexed
> hereto and incorporated herein as Exhibit "2" (hereinafter referred to as the "MARTONS'
> DDC Statement") and a copy of the response to that letter by Donald L. Citak, Esq., dated
> January 27, 2006, is annexed hereto and incorporated herein as Exhibit "2A"."

7.  In the interest of justice, Plaintiffs should be permitted to re-amend their Complaint to
    include this proposed change to allow the Complaint to conform to the now documented facts
    and circumstances involved in the instant case. To deny this amendment, provides Defendant
    with the potential opportunity to prevail on the instant motion without regard to the facts
    supported by documentary evidence.

8.  The proposed amendment is not futile since it permits Plaintiffs to present a valid defense to
    Defendant's unfounded allegation that we failed to disclose a pending disciplinary action in
    our application to Defendant for insurance coverage. As now established, the simple fact is
    that Plaintiffs had not yet received notice of the Martons' DDC Complaint when their
    application for insurance was sent to Defendant on January 20, 2006.

9.  Defendant is not prejudiced at all. The proposed amendment to the Plaintiffs' Amended
    Complaint sharpens that pleading to conform to documentary evidence. Defendant would not

4

be required to expend substantial resources investigating the veracity of that allegation (particularly since the documents are provided by Plaintiffs and are annexed to the proposed new Second Amended Complaint.) Furthermore, since Plaintiffs are moving to amend simultaneously with the instant motion to dismiss, no delay will result in the disposition of this matter.

10. Plaintiffs' motion to amend was not brought with undue delay; on the contrary, the Peterson Letter was located days prior to the submission of this motion, and only after requesting that the DDC search its files for documents reflecting the date of our actual receipt of the Martons' DDC Complaint.

11. Nor is there any bad faith in Plaintiffs' motion to amend; we are simply attempting to conform the pleadings to the documentary evidence to reflect the facts accurately and precisely. The Peterson Letter clarifies an issue now raised by Defendant; had it been located earlier, it could have and would have been provided to Defendant in an attempt to resolve the instant coverage dispute.

**Plaintiffs' Insurance Application Was Truthful**

12. In light of the foregoing, Defendant's allegation that Plaintiffs' application for insurance coverage somehow contained a misrepresentation relating to the disclosure of the Martons' DDC Complaint is simply unfounded and wrong. Plaintiffs' application for insurance coverage from Defendant was signed by Plaintiff Burton Citak, Esq. , dated January 20, 2006 and sent out on that date. See Exhibit "I" – Amended Complaint (and specifically Exhibit "1"

5

annexed thereto); Declaration of Burton Citak, dated February 28, 2007. That application
was mailed on January 20, 2006 by our firm to the named "Producer" of our insurance
policy, JLT Services, Corp. (hereinafter "JLT"), which received that application shortly
thereafter. Plaintiffs did not actually receive notice of the Martons' DDC Statement until
January 27, 2006. See Exhibit "II" – Proposed Amended Complaint ¶10 (specifically Exhibit
2A annexed thereto).

13. As a result, when Burton Citak signed and mailed Plaintiffs' insurance application to
Defendant on January 20, 2006, Plaintiffs were completely unaware that the Martons' DDC
Statement existed. Thus, Plaintiffs' response set forth to question number 35 on that
application was completely and entirely accurate.

14. This Court should also note that, when Defendant was notified of the Martons' DDC
Statement in June 2006, Defendant did not rescind their insurance policy, claiming a
"misrepresentation" in the application. Rather, Defendant kept our full premium for the term
of that insurance policy (April 28, 2006 - April 28, 2007). Moreover thereafter, Defendant
renewed its insurance coverage of us under a policy for the period from April 28, 2007- April
28, 2008. See Exhibit "III" annexed hereto.

15. Therefore, in light of the accuracy of Plaintiffs' application for the insurance coverage
sought, and Defendant's actions in not rescinding the subject insurance policy, keeping the
full premium, and even renewing coverage for another term period, Defendant's attempt to
disclaim coverage on the basis of an unfounded and unsubstantiated claim of

6

"misrepresentation" as to when Plaintiffs' first had knowledge of the Martons' DDC Statement is completely and entirely unreasonable.

**Plaintiffs' Pleading Must be Accepted as True and**
**Plaintiffs Must be Afforded Every Favorable Inference**

16. When evaluating a motion to dismiss, the factual allegations set forth in the complaint are to be accepted as true and all reasonable inferences are to be drawn in favor of the plaintiff. Thus, the allegations contained in Plaintiffs' Amended Complaint (and the Proposed Second Amended Complaint upon its acceptance by this Court) herein must be accepted as true and considered by this Court to be the facts in evaluating Defendant's motion to dismiss. An examination of the circumstances herein unequivocally establishes that a potential malpractice suit against our firm by the Martons could not reasonably have been foreseen until June 2006, when in fact Defendant was actually notified.

**The Martons' DDC Statement Does Not Reasonably Put Plaintiffs on Notice of an**
**Impending Malpractice Claim**

17. Defendants do not cite a single case holding that the mere filing of a statement by a client with the DDC reasonably puts an attorney on notice of an impending malpractice claim, requiring notification to the insurance carrier. Indeed, no such legal principle exists.

18. In fact, the cases cited in Defendant's Memorandum of Law are inapposite. Those cases deal with situations where an attorney commited a fatal error, omission, or negligent act so egregious, causing a client's case to be dismissed with prejudice and therefore barring any further action by the client because either the statute of limitations has run or the case been

7

marked off the calendar. In those cases, a reasonable attorney should expect a malpractice claim to be forthcoming.

19. But no such error was made by our firm in dealing with the Martons. In fact, the Martons obtained an arbitration award against Hogan Contracting Inc. (hereinafter referred to as "Hogan"), and then converted that award into a valid and enforceable judgment against Hogan. Plaintiffs could not have achieved any other result for the Martons had they continued as attorneys. Therefore, the Martons have not suffered any harm at all as a result of Plaintiffs' purported actions. The Martons are in the same legal position they arguably would have been, had they proceeded to arbitration against Hogan earlier. See Exhibit "I" - Amended Complaint ¶¶34 and 35 (specifically Exhibits 9 and 10 annexed thereto); Pltffs' Memo of Law pp 16-20.

**The Martons' DDC Statement Does Not Put a Reasonable Attorney on Notice of a Future Legal Malpractice Claim**

20. Defendant's contention that a reasonable attorney would have been on notice of a potential claim as a result of the allegations contained in the Martons' DDC Statement is completely without merit. The Martons' DDC Statement did not state the legal elements of a legal malpractice claim, does not allege any negligent acts by Plaintiffs and does not allege any pecuniary losses or other damages incurred as a result of Plaintiffs' purported conduct. Therefore, there was nothing in the Martons' conduct which would have place Plaintiffs on notice of a potential claim of malpractice. Pltffs' Memo of Law pp 20-22.

8

21. Defendant's assertion that the allegations contained in the Martons' DDC Statement are "virtually identical" to those contained in the Martons' malpractice complaint (Def. Memo of Law p4) is not only completely disingenuous, it is also completely wrong. Indeed, the Martons' DDC Statement does not allege <u>any</u> negligent conduct by Plaintiffs, nor does it allege any pecuniary loss or other damages alleged to have been suffered by the Martons. See <u>Exhibit "I"</u> - Amended Complaint ¶¶11-12 (specifically Exhibit 2 annexed thereto).

22. For an attorney to reasonably foresee a malpractice claim, acts of allegedly negligent conduct, along with damages or pecuniary losses, must have occurred or be claimed. Negligent conduct, or the claim of such, must be known to the attorney, such as in the case where a Statute of Limitations is missed. When we received the Martons' DDC Statement on or about January 27, 2006, neither situation existed. A letter or statement to a disciplinary committee does not, in and of itself, form the basis of a claim of malpractice against an attorney. Pltffs' Memo of Law pp 13-16.

23. A complaint to a DDC may be filed for a host of reasons, such as improper negotiations with a layman, excessive fees, misrepresenting a specialization, holding oneself out as engaging in dual practice, improper sharing of fees, conflict of interest, or misrepresenting admission to practice in another state. It cannot be fairly stated that merely because a client sends a statement to a DDC that, in and of itself, triggers reasonable notice to the attorney to whom the statement is sent that a malpractice suit or claim may reasonably ensue. Even the

pamphlet published by the DDC contains an entire section as to what the DDC "cannot do". Exhibit "XII" to DCitak Declaration.

### The Martons' DDC Statement Does Not Provide a Basis to Foresee a Legal Malpractice Claim

24. An examination of the assertions in the Martons' DDC Statement reveals that our firm could not have reasonably foreseen or anticipated a future malpractice suit as a result thereof. Following each quoted excerpt from the Martons' DDC Statement below, I provide the background refuting each statement and explain why those statements in and of themselves, or the conduct to which they refer, could not have reasonably put our firm on notice of a potential claim for malpractice.

### Excerpt from the Martons' DDC Statement

25. "In April 2000 I hired Citak & Citak to represent me against a Contractor that walked away from renovating my home in violation of a contract . . . ." See Exhibit "I" - Amended Complaint (specifically Exhibit 2 annexed thereto).

### Response

26. Our firm was not retained by the Martons in April 2000. Indeed, the Martons did not even contract with Hogan until May 2000. Our firm was not involved in any negotiations regarding the contract between them. In September 2000, when Mr. Marton became concerned about the time it was taking to complete the aforementioned project, he still had not contacted our firm.

10

27. On November 8, 2000, Mr. Marton requested that a letter be written on his behalf to Hogan, revoking any authorization that may have previously been granted for access to the Martons' Cooperative apartments. Denying that access was the Martons' initial primary concern. We believe that Mr. Marton came to us because we had a long-standing personal and professional relationship with Mr. Marton, who had maintained an office on the same floor in the same building as us at 18 East 48th Street, New York, NY 10017. Our firm had performed legal work for various cousins of Stuart Marton, on both personal matters (involving matrimonial and estate matters), as well as on litigation matters on behalf of corporate entities in which it is believed Mr. Marton may have had some ownership or beneficial interest. See Exhibit "I" - Amended Complaint ¶ 16.

28. That letter to Hogan was the only action that Martons authorized we take on their behalf at that time. At Mr. Marton's express request and direction, and as an accommodation to him without accepting any fee from him based upon the prior relationship that had existed between our firm and members of Mr. Marton's extended family, I wrote a letter to Hogan, dated November 15, 2000. No retainer agreement existed between our office and the Martons, nor had there been any discussion of fees for which the Martons would be obligated. That letter had been written merely to accommodate the Martons because of the afore-described long-standing personal and professional relationship between Mr. Marton, his extended family and their business interests and our firm.

11

29. After that letter was written, Mr. Marton would often stop in our offices, often unannounced, seeking advice on a number of matters relating to his contract dispute with Hogan.

30. Given the amount of time being expended on the Martons' behalf, on December 6, 2000, a letter was sent to Mr. Marton, setting forth the terms under which we would continue to render legal services in this matter. The sum of $500.00 was requested "to cover initial conference, consultations and communications". Exhibit "IV" to DCitak Declaration.

31. At that time, Mr. Marton did not want to proceed with litigation. He personally came to our offices on December 7, 2000 and offered to pay $250.00 to cover any and all services provided to Plaintiffs to date. Exhibit "V" to DCitak Declaration. Mr. Marton indicated that he would keep us abreast of the construction work required to complete the combining of the Martons' two (2) cooperative apartments. If and when they decided to take any further action against Hogan, Mr. Marton would contact us to undertake any such actions on his behalf.

32. Even though Mr. Marton maintained his office on the same floor as us, we received no communications from the Martons regarding their dispute with Hogan until the spring of 2002. Thus, from December 2000 until the spring of 2002, the Martons did not request any legal services be rendered on their behalf by us, nor did Mr. Marton drop by our offices seeking any. Therefore, any contention that the Martons communicated with us during that period or that we failed to take proper legal action on their behalf is both false and unsupported by any documentation.

**Excerpt from the Martons' DDC Statement**

33. "In the many months afterwards, Don Citak, Esq., filed a lawsuit, which was dismissed because the Court said the case had to be arbitrated." See Exhibit "I" - Amended Complaint (specifically Exhibit 2 annexed thereto).

**Response**

34. Most importantly, although the NYS Supreme Court dismissed the Martons' lawsuit, that dismissal was not fatal to their claim against Hogan, since the Court concluded only that arbitration was the proper forum for the Martons' action against Hogan. That decision did not in any way adversely affect the Martons' rights and remedies against Hogan. That conclusion is plainly confirmed by the fact that the Martons have obtained a judgment against Hogan, based upon their arbitration award!   See Exhibit "I" - Amended Complaint ¶¶ 34-35 (specifically Exhibits 9 and 10 annexed thereto).

35. Our case is readily distinguishable from one where a Statute of Limitations has run as a result of an attorney's dilatory tactics and a client is left without a legal remedy against a defendant. The Statute of Limitations never ran for the Martons to proceed against Hogan. Indeed, even after electing to wait from November 2004 (when Mr. Marton claims he "discovered" that the AAA had closed their file) until September 2006 (when the Martons re-filed their arbitration against Hogan), the Martons proceeded to and succeeded in arbitration against Hogan. See Exhibit "I" - Amended Complaint ¶¶11, 15, 34, 35 (specifically Exhibits 9 and 10 annexed thereto).

36. Despite claims to the contrary by the Martons and Defendant (see Def. Memo of Law p2 and Harwood Dec. Exhibit B ¶40), the decision to bring an action against Hogan on behalf of the Martons in court rather than in arbitration stemmed directly from documents received from and representations made by the Martons regarding their contract with Hogan.

37. By way of background, the contract signed by the Martons and Hogan was AIA Document A101-1997 ("the AIA Contract"). Exhibit "VI" to DCitak Declaration. The AIA Contract referenced another document, AIA Document A201-1997, the "General Conditions of the Contract for Construction" ("the General Conditions"), a document not signed by either party. The Martons never provided us with a copy of the General Conditions document that purportedly applied to their contract with Hogan. It was those General Conditions, which provided that disputes be submitted to mediation and arbitration before the American Arbitration Association (hereinafter "AAA").

38. Prior to filing a lawsuit on behalf of the Martons in court, we discussed with Mr. Marton the decision to proceed with a judicial action rather than arbitration, even though the General Conditions referred to in the Martons' A1A Contract (a copy of which he did not have) directed the parties to arbitration. In this context, Mr. Marton reiterated and emphasized his belief that he did not sign the General Conditions and did not believe that the General Conditions were part of his contract with Hogan. After Mr. Marton fully understood the reasons for proceeding procedurally in court, he signed the verification of the Complaint.

14

39. After the Complaint was served, Hogan moved to dismiss the Complaint pursuant to CPLR 3211(a)(1). In opposition thereto, Mr. Marton signed an Affidavit, sworn to on February 4, 2003, in which he swears to his belief that the General Conditions were not applicable to the Martons' contract with Hogan. Exhibit "VII" to DCitak Declaration. In paragraph 3 therein, Mr. Marton states that the General Conditions "should not even be considered" part of their agreement because "neither [Hogan] or [the Martons'] ever signed or initialed any copy of those General Conditions." Mr. Marton was emphatic in his belief that, at no time during the Martons' dealings with Hogan, were they ever provided or presented a copy of the General Conditions (thereby also confirming the fact that the Martons never had a copy to provide to us).

40. Thus, by proceeding in court, we were complying with the Martons' specific understanding of their contractual arrangement with Hogan. As a result, there existed no reason for us to believe that our actions in proceeding to court would be construed by the Martons as constituting negligence.

**Excerpt from the Martons' DDC Statement**

41. "Mr. Citak filed for arbitration but, apparently, the AAA did not take the case because the Contractor refused to accept them. I write 'apparently' because Mr. Citak never informed me that the AAA wouldn't take the case (I found out myself by contacting the AAA.) . . . In the process, Mr. Citak stated that if the contractor refused arbitration, Mr. Citak would return to

15

the court. Again, it appears that this did not happen." See Exhibit "I" - Amended Complaint
(specifically Exhibit 2 annexed thereto).

**Response**

42. After the dismissal of the Martons court action, we conferred with Mr. Marton as to how he
wished to proceed, if at all. We reminded him that there was little if any likelihood of
collecting any monies from Hogan, given Hogan's lack of assets, the apparent cessation of
business operations and the absence of any viable grounds on which to sue the contractor's
principal individually. Nevertheless, Mr. Marton requested that a demand for arbitration be
filed, which we proceeded to do. Exhibit "VIII" to DCitak Declaration.

43. On    November    19,    2003,    we    wrote    a    letter    to    Mr.    Marton,    stating:
"The fee for a Mediation/Arbitration is $750.00. Under your contract, you are required to
proceed to Mediation first and then to Arbitration. If you proceed to Mediation under the
present $ 325.00 filing fee, the fee for Arbitration at a subsequent date would be the full
$750.00. Please advise if you simply wish to proceed to Mediation at this time, or to proceed
to Mediation/Arbitration, in which case we request that you forward to us a check in the sum
of $425.00 payable to the American Arbitration Association, which we will tender to them."
Exhibit "IX" to DCitak Declaration.

44. The Martons never provided the monies to proceed with arbitration as we had requested in
our November 19, 2003 letter. See Exhibit "I" - Amended Complaint ¶¶13-14. Although we
advised the Martons that additional monies were required to commence arbitration
proceedings, we never received a response from them. The arbitration proceedings that the

Martons (and now Defendant) claim should have been commenced could not be initiated without payment of the requisite fees, which the Martons failed to remit to us. As attorneys, we would not have been required to advance these monies on the Martons' behalf. At no point did the Martons advise us that they wished to proceed solely to mediation.

45. We received a letter, dated November 21, 2003, from the AAA indicating that another form entitled "Submission to Dispute Resolution" would be required in this case and would require a signature from a representative of Hogan. Exhibit "X" to DCitak Declaration.  That form was thereafter sent to the attorneys for Hogan for signature.  Exhibit "XI" to DCitak Declaration.

46. In late November 2003, I spoke with Mr. Marton and discussed the overall posture of the case and re-iterated to him the likely futility of proceeding with this matter further in light of the absence of any realistic likelihood to collect any monies from Hogan. Mr. Marton scheduled an appointment to come to our offices on Wednesday December 3, 2003, presumably to discuss the matter further. Mr. Marton called and cancelled that meeting, indicating that he would reschedule at a later date, if he decided to proceed further. The Martons did not attend any meeting at our office on that date.  Based on that communication from the Martons, we understood that they were not interested in proceeding any further with the claim against Hogan. See Exhibit "I" - Amended Complaint ¶13.

47. At no time thereafter, except in their DDC Statement, did the Martons ever indicate to us their desire to arbitrate against Hogan.  The Martons did not call our office to re-schedule

that appointment. The Martons did not send us the requested monies with which to pay the filing fee to commence an AAA Arbitration proceeding. The Martons never expressed any disagreement with our assessment that there was little likelihood of collecting any money from Hogan. As a result, we understood that the Martons abandoned this matter and considered the matter to be closed. Thus, any failure to proceed with any arbitration against Hogan after December 2003 is due to the Martons' own choice.

48. Any action taken by the AAA to "close" the Martons' case was clearly without prejudice, since the Martons were not barred from initiating arbitration proceedings against Hogan, when they proceeded to do so nearly three (3) years later. The Martons' rights to proceed in arbitration against Hogan were not in any way lost by any actions or inactions that the Martons claim Plaintiff either did or did not do!

**Excerpt from the Martons' DDC Statement**

49. "Most importantly, from March 2004-September 2004, I made repeated requests to Mr. Citak asking for a status report—he never responded to me. My last request was a "demand" sent by certified, mail, return receipt requested. It was ignored." See Exhibit "I" - Amended Complaint (specifically Exhibit 2 annexed thereto).

**Response**

50. There is a factual dispute between Plaintiffs and Mr. Marton on this point (although the Martons' letter sent by certified mail was signed for by a receptionist not employed by Plaintiffs in the law suite in which we rented offices, it was not delivered to us). But in any

18

event, an attorney's failure to respond to a client's request for a status report does not constitute legal malpractice, especially where no harm has been incurred by the complaining party as a result thereof.

51. Mr. Marton's use of the phrase "most importantly" speaks volumes. Mr. Marton is primarily concerned why Plaintiffs were not continuing to represent him in his crusade against Hogan. Mr. Marton does NOT assert in his DDC Statement that he sustained any harm, any damages or pecuniary loss, as a result of Plaintiffs' alleged actions and/or inactions. See Exhibit "I" - Amended Complaint ¶¶ 11-12.

**Concluding Excerpt from the Martons' DDC Statement**

52. "I appreciate your efforts to understand why Mr. Citak ignores me and has not returned to Court to represent me." See Exhibit "I" - Amended Complaint (specifically Exhibit 2 annexed thereto).

**Response**

53. Thus the precise remedy sought by Mr. Marton in his DDC Statement is not money damages to recompense him for purported losses; rather it is a plea by Mr. Marton to somehow have the DDC force Plaintiffs to represent the Martons in pursuing their remedies against Hogan. The Martons' DDC Statement contains no nastiness, no hostility, no request for remuneration, no termination of the relationship; rather it only seeks the rendering of future services. Thus, given the entire tone of the Martons' DDC Statement, there is no basis upon

19

which an attorney would reasonably conclude or believe that an alarm was being sounded as a pre-cursor to a legal malpractice suit.

54. The Martons' DDC Statement does not claim that their opportunity to arbitrate has been lost by Plaintiffs' purported actions or inactions. Indeed, Mr. Marton expressly inquired why we ceased representing him and expressed an explicit desire to have Plaintiffs continue to represent the Martons in such a proceeding  Such a situation is thus diametrically opposite to one in which an attorney's alleged negligence adversely impacts or strips entirely a client of all legal rights to proceed against a defendant.

55. Thus, under the totality of the circumstances herein, the Martons' DDC Statement does not give rise to a reasonable expectation that a legal malpractice suit may be commenced. Moreover, in February 2007, the DDC closed its file and took no action whatsoever against our firm. See Exhibit "I" – Amended Complaint ¶27 (specifically Exhibit 6 annexed thereto). Only thereafter, did the Martons serve their legal malpractice suit.

**Plaintiffs Had No Knowledge of the Martons' March 12, 2006 Reply to the DDC until June 8, 2006**

56. Defendant erroneously and improperly contends that Plaintiffs should have foreseen a potential claim by the Martons when Mr. Marton sent a Reply Letter to the DDC in or about March 12, 2006, (hereinafter the "Martons' Reply Letter"). In that Reply Letter, Mr. Marton falsely and erroneously claims he had been left without a remedy against Hogan because of our alleged conduct.  Harwood Declaration Exhibit D.  Defendant is grossly misinformed and is attempting to ruse this Court.

20

57. In accordance with DDC rules and practices, the Martons were not obligated to, and in fact did <u>not</u>, provide a copy of their Reply Letter to us. Furthermore, the DDC does not as a matter of practice and policy provide copies of such replies to the responding attorneys (and in this case, did not provide a copy of the Martons' Reply Letter to Plaintiffs). Therefore, the fact that the Martons Reply Letter, dated March 12, 2006, was sent to the DDC does not in any way mean that Plaintiffs knew about the contents of that document. See <u>Exhibit "I"</u> - Amended Complaint ¶18.

58. On June 8, 2006, at the mediation session held under the DDC's auspices between Plaintiffs and the Martons, we were first made aware of the Martons' Reply Letter. At that mediation session on that date, the mediator provded us with a courtesy copy of the Martons' Reply Letter and gave it to us. See <u>Exhibit "I"</u> - Amended Complaint ¶20(c). Indeed, the copy of the Martons' Reply Letter annexed to Defendant's motion papers includes, on the first page in the upper right-hand corner, a specific notation in my handwriting stating: "Rec'd at Mediation June 2006." See Harwood Declaration <u>Exhibit D</u>.

59. Therefore, at no time <u>prior to June 8, 2006</u>, were we cognizant that the Martons had claimed (now falsely and erroneously!) to have been left without a remedy against Hogan, a situation for which they were claiming that we were responsible. Such a statement was entirely absent from the Martons' DDC Statement.

**No Reasonable Attorney Could Have Reasonably Foreseen a Potential Claim Until June 2006, At Which Time Plaintiffs Immediately Notified Defendants**

60. At the June 8, 2006 mediation, the DDC mediator, in sum and substance, advised the parties that it did not appear to him that there had been any violation of a Disciplinary Rule arising from the allegations set forth by the Martons. He further stated that he could not and would not render any opinion as to whether the Martons might have any other remedies, either against Hogan or against Plaintiffs for legal malpractice.  See Exhibit "I" - Amended Complaint ¶20.

61. As a result the mediator's comments and the copy of the Martons' Reply Letter provided to us at the June 8, 2006 mediation session, we first became aware that a potential legal malpractice claim existed.  See Exhibit "I" - Amended Complaint ¶22(A). Prior thereto, no complaint, formal law suit or formal proceeding of any kind had been commenced against us. Nor had we received any other communication, oral or written, other than the Martons' DDC Statement, concerning any potential claim that the Martons might assert against us for legal malpractice.  See Exhibit "I" - Amended Complaint ¶22(B).

62. Based solely upon the Martons' DDC Statement, no reasonable attorney would have believed that a claim for legal malpractice might be commenced: The Martons' representations caused us to initially file their claim against Hogan in court; any arbitration claim that the Martons had against Hogan was still viable and was not barred by any Statute of Limitation; their DDC Statement did not allege any acts of negligence nor did it claim that the Martons had sustained damages or pecuniary losses; and the remedy sought by the Martons from the DDC

was to force Plaintiffs to continue our representation of the Martons in their claim against Hogan.

63. On June 15, 2006, one (1) week after the June 8th mediation session at which we received a copy of the Martons' Reply Letter and at which the mediator commented about legal malpractice as a potential remedy, we notified JLT (the named "Producer" of Defendant's insurance policy) in writing of a potential claim by the Martons against us and requested that JLT take "whatever steps necessary" to notify Defendant of that potential claim there under. See Exhibit "I" - Amended Complaint ¶¶20-23 (specifically Exhibit 3 annexed thereto). Thus, in effect, we agree with Defendant's counsel that the Martons' Reply Letter (NOT their DDC Statement!) reasonably puts an attorney on notice of a potential claim. And with all due promptness (one (1) week) after receiving that Reply document, Plaintiffs did just what Defendant expects its insured to do – notify the carrier! Since this was the first instance in which the Martons mentioned a purported loss or damages, we in turn notified JLT of the potential of a claim. Defendant acknowledged receipt of the claim from Plaintiffs on June 15, 2006. See Exhibit "I"- Amended Complaint ¶24 (specifically Exhibit 4 annexed thereto).

**The Martons Had a Remedy Against Hogan And Obtained an Arbitration Award and Judgment Against Hogan**

64. Defendant's assertion that, before the inception of the subject insurance policy, Plaintiffs "knew" that the Martons had lost the opportunity to bring a claim against Hogan and that they blamed Plaintiffs for that purported loss, constitutes a blatant misrepresentation to this

Court. Since the Martons NEVER lost any opportunity to bring an arbitration claim against Hogan, it is in fact impossible to "know" any such thing!

65. For reasons known only to the Martons, they waited nearly two (2) years after first allegedly "learning" in November 2004 that their arbitration case had been "closed", before commencing a new arbitration proceeding against Hogan in September 2006. See Exhibit "I" - Amended Complaint ¶25 (specifically Exhibit 5 annexed thereto). In that time period, for reasons known only to the Martons, their only action was to file their DDC Statement.

66. The Martons prevailed in their arbitration action and, in May 2007, obtained a written decision from the arbitrator in the sum of $62,367.32 against Hogan from the AAA. See Exhibit "I" - Amended Complaint ¶34 (specifically Exhibit 9 annexed thereto). The Martons have confirmed that arbitration award in the NYS Supreme Court and have entered a valid judgment with interest, costs and disbursements against Hogan in the sum of $64,158.08. See Exhibit "I" - Amended Complaint ¶35 (specifically Exhibit 10 annexed thereto).

67. The Martons' successful prosecution against Hogan has left them with an enforceable judgment against Hogan and makes it painfully clear that they have sustained no harm whatsoever as a result of Plaintiffs' actions. The Martons are in the exact same legal position as judgment creditors of Hogan as they arguably might have been regardless of what actions Plaintiffs had undertaken for them.

24

**The Martons Knew That A Claim Against Hogan Was Likely to be Uncollectible**

68. On July 23, 2002, prior to commencing any court action against Hogan, I personally discussed with Mr. Marton the fact that Hogan was a wholly owned corporation with no known, identifiable assets. Mr. Marton was also unaware of any assets of that entity. There was no known insurance coverage, nor had the Martons insisted that a performance bond be posted by Hogan in connection with this project, nor had the Martons insisted that the owner of the corporate entity guaranty in any way the entity's debts to the Martons should there be any, nor was there any basis upon which to seek personal liability against the owner of the corporate entity. Mr. Marton was fully aware of the very real possibility that he would not be able to collect any money from Hogan to satisfy any such judgment, particularly since that entity could simply cease operations under that name or even declare bankruptcy.

69. That same information was essentially confirmed at a March 13, 2003 Supreme Court conference, during which Hogan's attorney represented that Hogan had no insurance coverage, was basically insolvent and was ceasing business operations. That information was subsequently conveyed by me personally to Mr. Marton.

70. Mr. Marton was and is a sophisticated and successful businessman, entrepreneur and real estate investor. At all times, he was well aware that, even if the Martons were successful in obtaining a judgment against Hogan, a corporate entity, there was no guarantee that there would be any monies from which to satisfy that judgment. The Martons negotiated their contract with Hogan themselves without advice or input from counsel. No personal guarantee

25

had been obtained from the individual owner of that entity and no surety bond for the contractor's performance on their project had been obtained. The Martons knew that they were dealing with a small, one man, wholly-owned general contracting corporation. The Martons knew of no assets owned by Hogan before entering into their contract with that entity, nor were they aware if any assets ever existed in the company's name. The possibility of simply ceasing business operations or even declaring bankruptcy to avoid any judgment was well known. From the very inception, they knew that there was a significant likelihood that the Martons would not collect anything from Hogan.

71. Upon information and belief, the Martons have not exhausted or even undertaken any efforts to collect on their judgment against Hogan. Any suggestion of harm focusing on Hogan's previously disclosed insolvency is without merit.

### Conclusion

72. Based upon the facts, the documents and the applicable law, a reasonable attorney could not have reasonably expected that the Martons would commence a legal malpractice suit against Plaintiffs, based solely on the Martons' DDC Statement (which does not assert any loss, damages or negligence, and specifically requests that Plaintiffs continue representing them), and the totality of the circumstances herein in which the Martons did not suffer any damages or loss and obtained an arbitration award and judgment against Hogan. Moreover, Plaintiffs were not aware of the existence of the Martons' Reply Letter until June 8, 2006 and no one could have reasonably expected a potential malpractice suit to be brought until that date.

Plaintiffs' notification of Defendant one (1) week later on June 15, 2006, was timely and did not contravene the terms of the subject insurance policy in any way.

73. Plaintiffs' motion to amend the Amended Complaint in the form annexed hereto (Exhibit "II") should be granted and Defendant's motion to dismiss Plaintiffs' pleading should be denied in its entirety.

Dated: New York, NY
February 28, 2008

_____
Donald L. Citak